**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Dale Joseph Burke, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| North Dakota Department of Correction | ) | Case No. 1:07-cv-004 |
| and Rehabilitation, North Dakota Protection | ) | |
| ad Advocacy Project, | ) | |
| | ) | |
| Defendants. | ) | |

## I.    BACKGROUND

The plaintiff, Dale Burke, is an inmate at the North Dakota State Penitentiary ("NDSP") in

Bismarck North Dakota.  Burke filed a *pro se* complaint with this Court under 42 U.S.C. § 1983

alleging a myriad of civil rights violations.

## II.    DISCUSSION

### A.    STANDARD GOVERNING INITIAL REVIEW

When a prisoner seeks to sue a governmental entity, officer, or employee, the court is

required to conduct a preliminary screening of the plaintiff's complaint under 28 U.S.C. § 1915A

to identify any cognizable claims and to dismiss the complaint, or any part of it, that is frivolous,

malicious, fails to state a claim, or seeks monetary relief from an immune defendant.

In conducting the review under 28 U.S.C. § 1915A, the court must keep in mind the

admonition of the Eighth Circuit that *pro se* prisoner complaints are to be liberally construed, and

the court is obligated to determine whether the complaint provides relief  "on any possible theory."

1

Haley v. Dormire, 845 F.2d 1488, 1490 (8th Cir. 1988).  The court may not dismiss the complaint unless it "appears beyond doubt that plaintiff can prove no set of facts that would demonstrate an entitlement to relief."  Gordon v. Hansen, 168 F.3d 1109, 1113 (8th Cir. 1999).

In this case, Burke alleges claims under 42 U.S.C. § 1983.  To state a claim pursuant to 42 U.S.C.§ 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).

**B.**     **SUMMARY OF THE CLAIMS**

**1.**     **CLAIM 1 - ADEQUACY OF GRIEVANCE PROCEDURES**

Burke alleges in his pro se complaint that the NDSP's grievances procedures are unfair, ineffective, and fall short of standards set forth in Part 40 of Title 28 of the Code of Federal Regulations to the extent that "the inmate is always wrong and the staff is always right."  In addition, Burke intimates that the NDSP does not always adhere to its policies and procedures.

An inmate's inability to obtain a favorable response to his grievance does not give rise to a cognizable constitutional claim.  See Tryon v. Dyke, 2007 WL 141142, *11(W.D. Ark. 2007); Dickens v. Taylor, 2006 WL 3190344, *9 (D. Del. Nov. 3, 2006) (an inmate cannot maintain constitutional claims based upon the fact that his grievances were denied); see also Gordon v. Vaughn, 1999 WL 305240, * 2 (E.D. Pa. May 12, 1999) (citing Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994)).  The same is true for claims of failure to follow grievance procedures and claims that grievance procedures are inadequate.  This is because prison grievance procedures do not confer any substantive constitutional rights upon inmates. Buckley v. Barlow, 997 F.2d 494, 495(8th Cir. 1993)

(no constitutional violation in failing to process all of the grievances submitted by the prisoner for this reason); Blackman v. Appeals of Coordinator at Corcoran State Prison, 2005 WL 1397785, *1 (E.D.Cal. 2005); see Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003) (no federal constitutional liberty interest in having prison officials follow state law or prison regulations).  In part, the reason why substantive rights are not conferred is because prisoners retain the right to seek relief from the courts.  Tyson v. Dyke, supra.[1]  Consequently, Burke's claim that the NDSP failed to strictly adhere to its grievance policies and procedures does not give rise to a federal civil rights claim.

Finally, Burke alleges that the grievance procedures employed by the North Dakota Department of Corrections and Rehabilitation ("NDDOCR") fail to meet the minimum standards promulgated by the United States Attorney General at 28 C.F.R. Part 40.  However, the federal statute which required the promulgation of the minimum standards was amended in 1996 by the Prison Litigation Reform Act (PLRA) and the amendments eliminated the use of the minimum standards.  See Porter v. Nussle, 534 U.S. 516, 523-524 (2002); Spruill v. Gillis, 372 F.3d 218, 226-227 (3rd Cir. 2004); see also  42 U.S.C. § 1997e, Historical and Statutory Notes to the 1996 Amendments, Pub.L. 104-134 (2003); 42 U.S.C. § 1997e(a)(2), (b) and (c) (West 1994); 46 FR 48186 (Oct. 1, 1981).   In fact, the current version of 42 U.S.C. § 1997e provides in subsection (b) as follows:

---

[1]  The court stated the following:
"Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts." Blagman, 112 F.Supp.2d at 542 (citing Flick v. Alba, 932 F.2d 728, 729 (8th Cir.1991)). A jail's "refusal to entertain such grievances does not compromise the inmate's constitutional rights, as access to the courts would still be available." Blagman, 112 F.Supp.2d at 542 (citing, Scott v. Kelly, 107 F.Supp.2d 706 (E.D.Va.2000), aff'd, 6 Fed. Appx. 187 (4th Cir.2001)). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." Cancel v. Goord, No. 00 CIV.2042, 2001 WL 303713, *3 (S.D.N.Y. March 29, 2001).
Tyson v. Dyke, 2007 WL 141142, *11.

The failure of a State to adopt or adhere to an administrative grievance procedure shall not constitute the basis for an action under section 1997(a) or 1997(c) of this title.

Even under the earlier version of 42 U.S.C. § 1997e, the standards promulgated pursuant to 28 C.F.R. Part 40 were never mandatory.  Rather, the purpose for the standards was their use in a voluntary scheme for requiring exhaustion of  prison remedies.  Under the earlier version of 42 U.S.C. § 1997e, a state could trigger a provision requiring prisoners to exhaust administrative prison remedies by voluntarily adopting grievance procedures that complied with federally-promulgated minimum standards, which included an option for certification of the state procedures by the Attorney General.  See Patsy v. Board of Regents of State of Fla., 457 U.S. 496, 510-511 (1982).  This exhaustion scheme was replaced in 1996 by a new scheme of mandatory exhaustion that is not dependent upon compliance with federally-promulgated standards.  Porter v. Nussle, 534 U.S. at 523-524; Spruill v. Gillis, 372 F.3d  at 226-227.

In summary, Burke has failed to sufficiently plead a violation of a right protected by the Constitution or federal law.  As a result, this claim is subject to dismissal without prejudice.


## 2. CLAIMS 2, 12, 13, AND 16 - RELIGIOUS DISCRIMINATION OR RETALIATION AND INTERFERENCE WITH RELIGIOUS PRACTICES

Burke filed suit against the North Dakota Department of Corrections and Rehabilitation in 2002, alleging that the NDSP had failed to adequately treat his Hepatitis C condition.  Although the parties were apparently able to resolve their differences out of court, Burke believes that penitentiary staff have since retaliated against him by disrupting, discriminating against, or otherwise interfering with the exercise of his religion.

4

Burke, a self-professed Hindu, complains that he has been denied a "religious study day" akin to one afforded to Christian inmates, as well as access to ritual items such as camphor, kumkum, incense, and butter lamps that he maintains are necessary in the practice of his religion. Burke also takes exception to what he describes as the penitentiary chaplain's refusal to recruit non-Christian volunteers to work with non-Christian inmates. Needless to say, Burke's claims are not a model of clarity. Nevertheless, the claims appear to be that penitentiary officials have wrongfully hindered the free exercise of Burke's religion and denied Burke equal protection of the law in violation of his First and Fourteenth Amendment rights.

### a)   FREE EXERCISE OF RELIGION

It is well-settled that prison authorities may not punish or discriminate against religious beliefs.  Nevertheless, the religious exercises of prisoners, as distinguished from their religious beliefs, may properly be the subject of legitimate administrative regulation and control so long as no particular religious groups are improperly discriminated against and the action taken is neither arbitrary nor unreasonable.  See Murphy v. Missouri Dep't of Corrections, 372 F.3d 979, 983-984 (8th Cir. 2004): Freeman v. Arpaio, 125 F.3d 732, 736 (9th Cir. 1997).

"In order to establish a free exercise violation, [an inmate] must show that the defendants burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith, without any justification reasonably related to legitimate penological interests." Freeman v. Arpaio, 125 F.3d 732, 736 (citing Turner v. Safley, 482 U.S. 78, 89 (1987); see also Doty v Lewis, 995 F. Supp. 1081, 1083 (D. Ariz. 1998) ("To state a First Amendment free exercise claim, the prisoner must also establish that the activity is 'rooted in' a belief that is religious in nature. A

prisoner claiming a free exercise violation must demonstrate 'not only that the subject conduct is religiously permitted, but that the conduct is religiously mandated or otherwise so central to the belief that its prohibition would impose a genuine burden on religious expression.").  It is clear that in determining whether the challenged conduct was reasonable, the court should consider several factors such as whether the regulation has a logical connection with a legitimate government interest, whether alternative means exist to exercise the asserted right, and the impact that accommodation of the prisoner's right would have on prison resources. Freeman v. Arpaio, 125 F.3d 732, 736 (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 350-52 (1987)); see Ali v. Szabo, 81 F. Supp. 2d 447, 470 (S.D.N.Y. 2000).

Camphor, kumkum, incense, and butter lamps are presumably used by Hindus in their rites or ceremonies.  Whether their use is mandated by the tenets of Burke's faith remain to be seen. Penitentiary officials may have legitimate security reasons for restricting Burke's access to these ceremonial items.[2]  Nevertheless, for the purposes of  this preliminary review, Burke's contention that penitentiary staff have impeded his ability to practice his faith by denying access to these items is arguably sufficient to state a cognizable free exercise claim under the First Amendment.

---

[2]   Courts have upheld prison bans on the use of incense by inmates, the basis generally being that such restrictions are rationally related to legitimate security interests  See e.g., Young v. Saunders, 34 Fed. Appx. 925, 926 (4th Cir. 2002) (per curium) (finding that a prison's restrictions on incense and candles were reasonably related to legitimate penological interests); Detmer v. Landon, 799 F.2d 929, 934 (4th Cir. 1984) (concluding that a security officer's concern about inmates' unsupervised possession of candles, salt, and incense was reasonable); Doty v. Lewis, 995 F. Supp. 1081, 1085 (D. Ariz. 1998) (acknowledging concerns expressed by prison staff that incense could be used by prisoners to mask the use of illegal drugs or narcotics).

### b.   **EQUAL PROTECTION**

"The Fourteenth Amendment requires that the government 'treat similarly situated people alike,' a protection that applies to prison inmates." Murphy v. Missouri Dep't of Corrections, 372 F.3d at 984.  To succeed with an equal protection claim, an inmate must demonstrate that he was treated differently than a similarly situated class of inmates, that the different treatment burdened one of his fundamental rights, and that the difference in treatment bore no rational relationship to any legitimate penal interest.  Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999) (recognizing that courts ordinarily defer to the expert judgment of prison authorities in prison cases).

Burke alleges that he was denied a study day akin to a Bible study day afforded to Christian inmates.  On its face, Burke's allegation constitutes a cognizable equal protection claim.  See Native American Counsel of Tribes v. Solem, 691 F.2d 382, 384 (opining that the denial of privileges to adherents of one faith while granting it to others is discrimination on the basis of religion). Consequently, Burke should be allowed to proceed with this claim at this preliminary stage.

With respect to Burke's claim concerning the penitentiary chaplain's alleged refusal to recruit non-Christian volunteers,  "[t]he Constitution does not require that a religious advisor be provided for every sect represented in a penitentiary." Blair-Bey v. Nix, 963 F.2d 162, 163 (8th Cir. 1992) (citing Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1977) (per curium)).  See Brown ex. rel. Indigenous Inmates at N.D. State Prison v. Schuetzle, 368 F. Supp. 2d 1009, 1020-21 (D.N.D. 2005). "Nor does the Constitution require that prisoners be provided the religious advisor of their choice or one that belongs to their individual religious sect." Blair-Bey v. Nix, 963 F.2d 162, 163.

Burke has not alleged that he was ever denied access to or visits with religious advisors, peers, or volunteers.  In addition, there is nothing in the pro se complaint to suggest that the

penitentiary chaplain's recruitment efforts or lack thereof have hindered or otherwise affected Burke's ability to exercise his religious beliefs.  Even though it appears very doubtful that Burke has a legitimate claim with respect to the penitentiary chaplain's alleged refusal to recruit non-Christian volunteers, it cannot be concluded at this preliminary stage that there are no set of facts he could prove that would entitle him to relief.  Based on the foregoing, Burke should be allowed to proceed with Claims 2, 12, 13, & 16.


### 3.      CLAIMS 3 AND 4 - FAILURE TO PROTECT/RETALIATION FOR FILING GRIEVANCES

Burke also alleges that prison officials retaliated for his having filed a lawsuit in 2002 by placing inmate Harry Leftbear, described by Burke as a "known racist Native American" who "hates caucasians," in the cell next to Burke.  Leftbear allegedly assaulted Burke on January 17, 2007. Burke alleges that the assault took place in view of a correctional officer who failed to take appropriate steps to protect him.  Burke filed a grievance and complained that little, if anything, was done by the prison staff to stop Leftbear from attacking him.  The warden denied Burke's grievance with the explanation that the officer on the scene was acting in accordance with established protocol and had done nothing wrong.  Thereafter, Burke was charged with a Class "A" violation for provoking or goading Leftbear into the attack. Burke alleges that the penitentiary staff created the opportunity for the assault that took place and failed to take appropriate action to protect him when it was known that Burke was in danger of being physically assaulted by Leftbear.  Burke further claims that he received a Class "A" writeup and in retaliation for filing a grievance against the officer who witnessed the assault.

8

The Eighth Amendment prohibition against cruel and unusual punishment "requires prison officials to take responsible measures to guarantee the safety of inmates and to protect them from violence by other prisoners." Nei v. Dooley, 372 F.3d 1003, 1006 (8th Cir. 2004); see Williams v. Willits, 863 F.2d 586 1020, 1024 (8th Cir. 1988) (opining that prisoners have a clearly established Eighth Amendment right to be reasonably protected from known dangers of attacks by fellow inmates). To prevail on an Eighth Amendment failure-to-protect claim, the inmate must show he was incarcerated under conditions posing a substantial risk of serious harm and the prison officials subjectively knew of and disregarded that safety risk. Nei v. Dooley, 372 F.3d 1003, 1006 (8th Cir. 2004); see also Williams v. Willits, 863 F.2d 586 1020, 1024 (8th Cir. 1988) (requiring a showing that prison officials were at least deliberately negligence in their failure to break up a fight between inmates). The Eighth Circuit has articulated the test as a "prison official violates the Eighth Amendment if he or she 'acts with deliberate indifference to a substantial risk of harm to the prisoner.'" Blades v. Schuetzle, 302 F.3d 801, 803 (8th Cir. 2002) (quoting Perkins v. Grimes, 161 F.3d 1127, 1130 (8th Cir. 1998) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

To show deliberate indifference, a prisoner must prove (1) an objective component, namely whether there was a substantial risk of harm to the prisoner from another prisoner; and (2) a subjective component, whether the prison official was deliberately indifferent to that risk. Tobias v. Campbell, 202 F. Supp. 2d 934, 937 (E.D. Mo. 2001). To prove the last prong of the two-part test, a prisoner must prove facts created an inference that could be drawn that there was a substantial risk of serious harm to the inmate and that official drew that inference. Blades v. Schuetzle, 302 F.3d at 803.

Whether Burke will be able to actually prove what he has alleged remains to be seen.[3] However, at this stage, he has sufficiently pled claims of an Eighth Amendment violation with respect to Claims 3 and 4.

### 4. CLAIM 5 - IMPOSITION OF A CRUEL AND UNUSUAL SENTENCE

Burke was convicted of two counts of murder and one count of arson in North Dakota. On September 17, 1998, he was sentenced to serve two life sentences without the possibility of parole on the murder convictions and ten years on the arson conviction. Following the sentencing hearing in state court, Burke was remanded into the custody of the North Dakota Department of Corrections and Rehability for incarceration at hard labor pursuant to N.D.C.C. § 12-47-04. Burke claims that his incarceration at hard labor constitutes cruel and unusual punishment by virtue of the fact that, prior to his conviction and incarceration, he was deemed disabled as defined by the Social Security Act.

On its face Burke's claim goes beyond the conditions of his confinement. Instead, Burke is challenging the validity of the sentence originally imposed by the state district court. It is well-established that such a challenge is not cognizable under the guise of civil rights claim under 42

---

[3] Notably, not "'every injury suffered by one prisoner at the hands of another . . . . translates into constitutional liability for prison officials.'" Id. (quoting Farmer v. Brennan, 511 U.S. at 834). Prison officials must only take "'reasonable measures to abate substantial risk of serious harm, of which the officials are aware.'" Id. (quoting Reece v. Groose, 60 F.3d 487, 491 (8th Cir. 1995)). This standard does not require the indefinite segregation of all "'inmates whose original crimes suggest they might be capable of further violence.'" Id. at 803-04 (quoting Curry v. Crist, 226 F.3d 974, 978 (8th Cir. 2000)). In this same regard, a prison does not need to segregate inmates indefinitely that may be targeted by other inmates because of the nature of their underlying conviction. A prison houses individuals that have not been able to conform to the rules and obligations of society. Within a prison, "threats between inmates are common and do not, in every circumstance, serve to impute actual knowledge of a substantial risk of harm." Id. at 804 (internal quotes omitted). Therefore, the pertinent time to determine the "relevant prison official's knowledge [is] the time in question, not with hindsight's perfect vision." Id. (quoting Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998)).

U.S.C. § 1983 claim.  Wilkinson v. Dotson, 544 U.S. 74, 78-82 (2005)  ("prisoner in state custody cannot use a § 1983 action to challenge 'the fact or duration of his confinement.'").  As a result, this claim should be dismissed without prejudice.

### 5.   CLAIM 6 - RETALIATION THROUGH REFUSAL TO ACCOMMODATE DISABILITY

According to Burke, he was required to work once incarcerated despite his disability and he has lost his job on numerous occasions.  Burke filed a grievance concerning this issue and requested that he be placed on "disability status."  The deputy warden denied the grievance and explained that such a designation does not exist in the correctional environment.  However, Burke believes that the denial of his grievance was motivated by lingering ill-will over the commencement of an earlier lawsuit against the state in 2002.

It is well-settled that "compelling prisoners to work beyond their strength is a violation of the Eighth Amendment."  Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (citing Ray v. Mabry, 556 F.2d 881, 882 (8th Cir. 1977)).  At this preliminary stage, Burke should be allowed to proceed with Claim 6.

### 6.   CLAIM 7 - DISABILITY DISCRIMINATION

Burke also contends that he has been discriminated against by NDSP officials in violation of the Americans with Disabilities Act ("ADA") to the extent they have denied him placement in a special housing unit on account of his mental illness and the diagnosis of Hepatitis C, conditions he refers to as "disabilities."  The significance of such a placement is that it is generally accompanied with special privileges.

11

Title II of the ADA prohibits disability discrimination by a "public entity" in the administration of its services, programs, or activities. 42 U.S.C. § 12132.  The ADA generally extends to disability discrimination against state prison inmates. See United States v. Georgia, 546 U.S. 151 (2006); Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 212-13 (1998), but there may be circumstances in which the state may have Eleventh Amendment defenses.  See Tennessee v. Lane, 541 U.S. 509 (2004); Klinger v. Director, Department of Revenue State of Missouri, 455 F.3d 888 (8th Cir. 2006); Perry v. Missouri Department of Corrections, 2007 WL 892460, *2-3 (E.D. Mo. 2007); Zied-Campbell v. Richman, 2007 WL 1031399 (M.D. Pa. 2007). The foregoing cases clearly indicate that this is a complicated and evolving area of the law.

To prove a claim under Title II of the ADA, an inmate must establish (1) that he is a qualified individual with a disability; (2) that he was excluded from the participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such entity; (3) by reason of such disability.  See Schotz v. Gates, 256 F.3d 1077, 1079 (11th Cir. 2001); see also Thompson v. Davis, 295 F.3d 890, 895 (9th Cir. 2002); Love v. Westville Corr. Ctr., 103 F.3d 558, 560 (7th Cir. 1996).  A "qualified individual with a disability" under the ADA "means an individual with a disability who, with or without reasonable modifications to rules, policies or practices ... meets the essential eligibility requirements for the ... participation in programs or activities provided by a public entity.  See 42 U.S.C. § 12131.

It is questionable whether Burke can satisfy the first prong of the test, namely, that he is a "qualified individual with a disability."  Burke maintains that he is disabled as defined by the ADA and therefore qualified for placement in preferred housing because the Social Security Administration ("SSA") had previously approved his application for disability benefits.  While the

SSA's disability determination is relevant, it is not dispositive for ADA purposes.  See Sanchez v. City of Chicago, 2007 WL 647485 at *7 (N.D. Ill. February 28, 2007); Lawson v. CSC Transp., Inc., 245 F.3d 916, 927 (7th Cir. 2001).  The same can said with respect to his diagnosis of Hepatitis C because "[n]ot every illness qualifies as an ADA disability, even if the disease is life threatening." Quick v. Tripp, Scott, Conklin & Smith, P.A., 43 F.Supp.2d 1357, 1366-67 (S.D. Fl. 1999) (dismissing the plaintiff's suggestion Hepatitis C is a disability per se); see Taylor v. Principal Fin. Group. Inc., 93 F.3d 155, 164 (5th Cir. 1996) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.").  Questions of disability aside, it would stand to reason that Burke's housing options may be restricted by virtue of the fact that he is or at one time was suffering from a highly infectious disease.  See School Board of Nassau County v. Arline, 480 U.S. 273, 287 n.16 (recognizing that it is well-settled, at least outside the prison environment, that a person who poses a significant risk of communicating an infectious disease to others in his proximity is not considered to be "qualified" so long as reasonable accommodations do not eliminate that risk).

It is also questionable whether Burke can satisfy the second prong of the test.  Burke takes issue with the fact that he has been placed on a waiting list with other inmates for special housing. Burke's mere presence on this list is an indication that he has not been denied any special benefits or discriminated against by NDSP staff.  Just as Burke should not be discriminated against on the basis of a purported disability, he should not be able to curry special favor or receive favorable treatment and moved atop a waiting list simply because he may subjectively believe that he is more deserving than others.

Nevertheless, Burke's allegations regarding disability discrimination are sufficient at this preliminary stage to state cognizable claims of violations of federally-protected statutory rights under the ADA.  Construing the complaint liberally and giving Burke the benefit of all doubt, the determination of whether Burke suffers from a disability and whether he has been singled out as a consequence must be left to a later determination.


### 7.       CLAIM 8 - FAILURE TO ENFORCE

Burke contends that the North Dakota Protection and Advocacy Project[4] violated his civil rights by refusing to pursue his claims of disability against NDSP officials.  However, Burke's complaint does not state a claim for a violation of constitutional law.  Further, although 42 U.S.C. §1983 provides a basis to enforce rights protected by a federal statute, it does not provide a basis for the general commencement of lawsuits to enforce violations of federal law.  Gonzaga University v. Doe, 536 U.S. 273, 282 (2002).  In order to be actionable under 42 U.S.C. § 1983, the federal statute must confer "specific, individually enforceable rights" upon the person who seeks to enforce the statute and evidence an intent that these rights can be privately enforced.  Id. at 279-285.

A review of the federal statute providing for the creation of state protection and advocacy systems reveals no intent on the part of Congress to provide a private remedy to review individual decisions of the protection and advocacy organizations regarding whether to provide services to particular individuals.  While there is language in the statute that provides  a grievance procedure to ensure that prospective clients have full access to the system and to ensure that the system is operating in compliance with federal law (42 U.S.C. § 10805(9)), the law stops short of

---

[4] North Dakota Protection and Advocacy is a state agency whose purpose is to advocate for, and protect the legal rights of, people with disabilities.

unambiguously declaring enforceable rights, see Gonzaga, 536 U.S. at 283-284 & n.3 (citing examples of statutes the Supreme Court has held have unambiguously created rights enforceable by private remedy); Hunter v. Underwood, 362 F.3d 468, 478-479 (8th Cir. 2004). The statute is typical of other federal legislation enacted by Congress under its spending power in that it provides funding only for state protection and advocacy systems that the Secretary of HHS determines are "eligible" and for periodic reporting to the Secretary to ensure compliance.  42 U.S.C. § 10803 & 10805(7). The Supreme Court has made it clear that the primary enforcement mechanism for this type of legislation is a termination of federal funds, absent a clear indication by Congress that something more was intended.  Gonzaga, 536 U.S. at 279-283; cf. Blessing v. Freestone, 520 U.S. 329 (1997); Suter v. Artist, 503 U.S. 347 (1991).

Even if the court is wrong about the statute not creating an enforceable right, the federally enforceable rights created must correspond to the individual's particular complaint in order to be actionable under 42 U.S.C. § 1983.  Burke acknowledges in his complaint that the state agency provides services to prisoners and that it considered his claims of mental illness.  Burke's only complaint is that the state agency refused to take action against the NDSP.  With respect to this claim, there is no indication whatsoever that Congress intended to create an enforceable right requiring a state agency to take action against a third party.  There is no language in the statute that unambiguously creates such a right.  It is apparent that there are a number of discretionary elements involved in the pursuit of any enforcement action, as well as funding considerations and priorities for the use of resources, that preclude the finding of such a right. See Gonzaga, 536 U.S. at 340-341 (stating that one of the criteria for whether an individually protected exists is that it must not be "so

'vague and amorphous' that its enforcement would strain judicial competence."); 42 U.S.C. §§ 10805 & 10807.

8.      **CLAIM 9 - FAILURE TO ACKNOWLEDGE DISABILITY**

Burke's ninth claim reads as follows: "Rob Hier and Doctor Hagan of NDDOCR ADA Committee refuse to recognize plaintiff disability and refuse to even give plaintiff a disability hearing where plaintiff could show them his records of disability."  When looking at Burke's complaint as a whole, such assertions do not constitute a claim separate and distinguishable from Burke's claims of disability discrimination.  As such, the claim is devoid of merit.

9.      **CLAIMS 10 AND 14 - FAILURE TO PROVIDE ADEQUATE MEDICAL CARE/DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**

Burke contends that he has been deprived of adequate medical care while incarcerated at the NDSP.  Specifically, he contends that penitentiary officials have steadfastly refused to have him psychologically tested, have denied him mental health treatment, and have refused to provide therapy.  Burke also contends that NDSP officials have exhibited deliberate indifference to his medical needs to the extent they have refused to provide him with a prescribed athletic supporter in a timely fashion.

The Eighth Amendment requires that the government "provide medical care for those whom it is punishing by incarceration."  Robinson v. Hager, 292 F.3d 560, 563 (8th Cir. 2002).  In Jolly v. Knudsen, the Eighth Circuit has described the extent of this duty and what is required to prove a breach as follows:

> Prison officials or their agents violate the eighth amendment if they commit "acts or omissions sufficiently harmful to evidence deliberate indifference to [an inmate's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Our court has interpreted this standard as including both an objective and a subjective component: "The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997). "The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995).

Jolley v Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000).

To make out a claim of a constitutional violation under 42 U.S.C. § 1983, a plaintiff must demonstrate that he suffered an actual or imminent injury in fact. Smith v. Arkansas Dep't. of Corrections, 103 F.3d 637, 643 (8th Cir. 1996) (citing Lewis v. Casey, 518 U.S. 343 (1996); see also Maurice B. Madison-Bey v. Correctional Medical Services, No. 05-2418 (8th Cir. May 11, 2006) (holding § 1983 complaint failed because plaintiff did not allege that he suffered harm as a result of an unconstitutional policy or custom). "When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should be measured by reference to the *effect* of delay in treatment." Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005).

Keeping in mind the Eighth Circuit's admonition that *pro se* prisoner complaints are to be liberally construed and that the court is obligated to determine whether the complaint provides relief on any possible theory, it appears Burke has arguably stated a weak but cognizable Eighth Amendment claim and it cannot be said at this early stage that there are no set of facts that the plaintiff can prove that would demonstrate an entitlement to relief. Consequently, at this stage, Burke should be permitted to proceed with his claim of a violation of Eighth Amendment rights.

## 10.   CLAIM 11 - CRUEL AND UNUSUAL CONDITIONS OF CONFINEMENT

Burke contends that, in addition to being denied "honor housing," he has been denied afternoon recreation and access to sunlight on account of the fact that he unable to retain his job. A failure to provide an opportunity for adequate recreation can amount to cruel and unusual punishment under the Eighth Amendment, particularly if a prisoner's muscles are allowed to atrophy or the prisoner's health is threatened.  See Delaney v. DeTella, 256 F.3d 679, 683-684 (7th Cir. 2001); Wishon v. Gambon, 978 F.2d 446, 448-449 (8th Cir. 1992). There is some authority that suggests, in certain circumstances, that deprivation of sunlight may constitute an Eight Amendment violation.  See Richard v. Reed, 49 F. Supp. 2d 485, 488 n. 5 (E.D. Va. 1999) *aff'd* 188 F.3d 503 (4th Cir. 1999).

Again, giving Burke every benefit of the doubt, it cannot be concluded at this preliminary stage that there are no facts that Burke can prove that would entitle him to relief.  As a result, Burke should be allowed to proceed with this claim at this stage of the litigation.

## 11.   CLAIM 15 - IMPOSITION OF CO-PAYMENTS FOR MEDICAL CARE CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT

Burke claims that he is charged $3.00 each time he sees a nurse at the NDSP.  He contends that such charges constitute cruel and unusual punishment in violation of the Eighth Amendment. However, the imposition of such a fee is not so reprehensible as to constitute cruel and unusual punishment, especially in light of the fact that there is nothing in the pleadings to suggest that Burke's access to a nurse is predicated upon his ability to pay or that he is otherwise being denied "minimal civilized measure of life's necessities."  Roberson v. Bradshaw, 198 F.3d 645, 647 (8th Cir.

1999 (no constitutional violation in making prisoners pay for their medical care if they can afford to do so); <u>Tryon v. Dyke</u>, WL 141142 at *15; <u>cf.</u> <u>Buckley v. Barlow</u>, 997 F.2d 494, 496 (8th Cir. 1993) (<u>quoting</u> <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981) and finding no Eighth Amendment violation with respect to a $7.50 "idle pay" charge to a prisoner's account).  This claim is devoid of merit on its face and should be dismissed.

### 12.   CLAIM 17 - RETALIATION BY DISCLOSING PLAINTIFF AS CONFIDENTIAL INFORMANT

Burke also contends that in retaliation for his earlier lawsuit against the state, NDSP officials released a letter identifying him as a confidential informant to Michael Damron ("Damron"), a fellow inmate.  Burke claims that release of this letter jeopardized his physical safety by exposing him to inmate retaliation and has made him a target of civil suit filed by Damron.

Burke does not elaborate on the contents of the letter or the circumstances of its release. Nevertheless, Burke's contention that NDSP staff identified him as an informant with the intent to do him harm may arguably support a cause of action under 42 U.S.C.§ 1983.  <u>See</u> <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135, 1138 (8th Cir. 1989) (recognizing that labeling an inmate a snitch has the potential for great harm and may violate constitutional guarantees); <u>see</u> <u>also</u> <u>Benefield v. McDowall</u>, 241 F.3d 1267, 1271 (10th Cir. 2001) ( recognizing that labeling an inmate a snitch may constitute deliberate indifference to the safety of that inmate); <u>Harmon v. Berry</u>, 728 F.2d 1407, 1409 (11th Cir. 1984) (concluding that  inmate's claim that prison officials have labeled him a snitch and are exposing him to inmate retaliation was, on its face, sufficient to carry the cause of action through the service of process stage); <u>Watson v. McGinnis</u>, 964 F. Supp. 127, 131-32 (S.D.N.Y.

19

1997) (observing that "[o]ther circuits have held that a correction officer's calling a prisoner a "snitch" in front of other inmates constitutes an Eighth Amendment violation.").

### C.      ELEVENTH AMENDMENT

Burke has alleged two ADA claims.  Burke's remaining claims, with one possible exception of a supplemental state-law claim, are being brought pursuant to 42 U.S.C. § 1983.  42 U.S.C. § 1983 does not provide a waiver of state sovereign immunity under the Eleventh Amendment.  Quern v. Jordan, 440 U.S. 332, 340-41(1979).  As a result, Burke's Section 1983 claims are subject to dismissal on this basis.  However, Burke can avoid this problem by simply naming an appropriate state officer in his official capacity as a party defendant since state officers acting in their official capacities are subject to suit under 42 U.S.C. § 1983 for prospective injunctive relief.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 n.14 (1989); Ex parte Young, 209 U.S. 123, 159-160 (1908).

In this case, Burke has named only the NDDOCR and the North Dakota Protection and Advocacy Project as defendants.  Neither are subject to suit under the Eleventh Amendment for the Section 1983 claims since they are both agencies of the State.  Consequently, the North Dakota Protection and Advocacy Project should be dismissed from this action since the only claim made against it is Claim 8, which is a Section 1983 claim.  Claim 8 is also subject to dismissal for failure to state a claim.  The NDDOCR is in a different position since, in addition to being sued under Section 1983, it is also being sued under the ADA.  Consequently, the claims as identified below against the NDDOCR should be allowed to go forward at this preliminary stage with the

understanding and warning to Burke that the Section 1983 claims against the NDDOCR are subject to dismissal if he fails to name an appropriate party defendant.

## III.   **CONCLUSION AND RECOMMENDATION**

Having conducted an initial review of Burke's amended complaint and viewing the claims in a light favorable to Burke, it is **ORDERED**:

1)      Burke may proceed at this preliminary stage with Claims 2, 3, 4, 6, 7, 10, 11, 12, 13, 14, 16, and 17.

2)      Claims 1, 5, 8, and 9 are **DISMISSED WITHOUT PREJUDICE** for failure to state a claim upon which relief can be granted, and Claim 15 is **DISMISSED WITH PREJUDICE** as being devoid of merit.

3)      The North Dakota Protection and Advocacy Project shall be dismissed without prejudice on the grounds of Eleventh Amendment immunity with respect to the sole claim brought against it, and also on the grounds that the claim fails to state a claim upon which relief can be granted.

The Court directs the Clerk of Court to serve the remaining defendant named in the amended complaint with a copy of Burke's amended complaint.

**IT IS SO ORDERED.**

Dated this 16th day of May, 2007.

                                  /s/ Daniel L. Hovland
                                  Daniel L. Hovland, Chief Judge
                                  United States District Court

21