**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Dale Joseph Burke, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY** |
| vs. | ) | **JUDGMENT** |
| | ) | |
| North Dakota Department of | ) | |
| Correction and Rehabilitation, | ) | |
| Warden Tim Schuetzle, Deputy | ) | Case No. 1:07-cv-004 |
| Warden Pat Branson, Medical Director | ) | |
| Kathy Bachmeier, Correctional Officer | ) | |
| J. Peterson, and Lieutenant Ron Bjelland, | ) | |
| in their official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

_____

Before the Court is the Defendants' Motion for Summary Judgment filed on May 1, 2008.

See Docket No. 40.  The Plaintiff filed three motions for an extension of time to file a response.

See Docket Nos. 49, 62, 64.  The Court granted each of the Plaintiff's motions, and ultimately gave

the Plaintiff until November 7, 2008, to file a response.  See Docket Nos. 51, 63, 65.  On November

5, 2008, the Plaintiff filed a response in opposition to the Defendants' motion.  See Docket No. 70.

On November 13, 2008, the Defendants filed a motion for an extension of time to file a reply brief.

See Docket No. 75.  The Court granted the Defendants' motion, and gave the Defendants until

December 12, 2008, to file a reply brief.  See Docket No. 76.  The Defendants filed a reply on

December 12, 2008.  See Docket No. 77.  The Plaintiff filed a surreply on December 17, 2008.  See

Docket No. 78.  The Court gave the Defendants until February 5, 2009, to file a response to the

Plaintiff's surreply.  See Docket No. 84.  On February 5, 2009, the Defendants filed a response to the

Plaintiff's surreply.  See Docket No. 85.  For the reasons set forth below, the Court grants the

Defendants' motion for summary judgment.

## I.   __BACKGROUND__

The plaintiff, Dale Joseph Burke, was convicted of two counts of murder and one count of arson in North Dakota state court.  On September 17, 1998, he was sentenced to two life sentences without the possibility of parole on the murder convictions, and to ten years on the arson conviction. Burke was remanded to the custody of the North Dakota Department of Corrections and Rehabilitation (DOCR) for incarceration and hard labor pursuant to N.D.C.C. § 12-47-04.

Burke is an inmate at the North Dakota State Penitentiary (NDSP).  He initiated a civil rights action under 42 U.S.C. § 1983 on January 23, 2007, in which he raised a myriad of claims.  See Docket No. 2.  On May 16, 2007, the Court conducted a preliminary screening of Burke's complaint under 28 U.S.C. § 1915A to identify any cognizable claims and to dismiss any part of the complaint that is frivolous, malicious, fails to state a claim, or seeks monetary relief from an immune defendant. See Docket No. 4.  The Court dismissed four of the claims (claims 1, 5, 8, and 9) without prejudice, dismissed one of the claims (claim 15) with prejudice, and found the remaining claims (claims 2, 3, 4, 6, 7, 10, 11, 12, 13, 14, 16, and 17) cognizable.  In the twelve surviving claims, Burke alleges statutory and constitutional violations, including interference with the free exercise of religion, lack of adequate medical care, retaliation for exercising his constitutional rights, failure to protect, refusal to accommodate his disability, and cruel and unusual punishment.

On May 29, 2007, Burke filed a motion for leave to file an amended complaint to include the following defendants to be sued in their official capacities:  Warden Tim Schuetzle, Deputy Warden Pat Branson, Medical Director Kathy Bachmeier, Correctional Officer J. Peterson, and Lieutenant Ron Bjelland.  See Docket No. 6.  The individual defendants are employees of the NDSP.  On October 10, 2007, the Court granted Burke's motion for leave to file an amended complaint.  See Docket No. 16.  On October 10, 2007, Burke filed an amended complaint setting forth the same

2

seventeen claims as in the original complaint, but adding the individual defendants to be sued in their official capacities.  <u>See</u> Docket No. 17.

On April 28, 2008, Burke filed a motion for a temporary restraining order against NDSP Correctional Officer Barb Bailey "to stop harassing and interfering with plaintiffs legal work and law library rights and his access to the courts."  <u>See</u> Docket No. 38 (error in original).  The Court denied the motion on April 29, 2008.  <u>See</u> Docket No. 39.  On October 24, 2008, Burke filed a motion for a temporary restraining order against Medical Director Kathy Bachmeier "to treat plaintiffs testicle pain and allow plaintiff to purchase a new jock strap."  <u>See</u> Docket No. 67 (error in original).  On November 3, 2008, the Court denied Burke's motion for a temporary restraining order against Kathy Bachmeier.  <u>See</u> Docket No. 69.

In his 42 U.S.C. § 1983 action, Burke seeks monetary damages and injunctive relief from the Defendants.  The Defendants move for summary judgment on all twelve surviving claims.  The Defendants contend that there are no material facts in dispute and that they are entitled to judgment as a matter of law.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  <u>Davison v. City of Minneapolis, Minn.</u>, 490 F.3d 648, 654 (8th Cir. 2007); <u>see</u> Fed. R. Civ. P. 56(c).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party bears the ultimate burden of proof to establish that there are no genuine issues of material fact, and that the movant is entitled to judgment as a matter of law. Carrington v. City of Des Moines, Iowa, 481 F.3d 1046, 1050-51 (8th Cir. 2007).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

## III.   **LEGAL DISCUSSION**

Of Burke's twelve claims, he has alleged one claim pursuant to Title II of the Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. § 12131 et seq., and the remaining eleven claims are brought pursuant to 42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).

> A bulwark for individual liberties, 42 U.S.C. § 1983 provides legal redress to individuals who suffer violations of their federal rights at the hands of any "person" who acts "under color" of state law.  That being so, a § 1983 plaintiff can prevail only if he proves he has been subjected to a deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States."  And naturally,

the challenged conduct must have been committed by one who acts "under color of state law."

Montano v. Hedgepeth, 120 F.3d 844, 848 (8th Cir. 1997) (citations omitted).


A.      **CLAIMS 2, 12, 13, AND 16 – RELIGIOUS DISCRIMINATION OR RETALIATION AND INTERFERENCE WITH RELIGIOUS PRACTICES**

Burke is a self-proclaimed practicing shaivite Hindu.  In claims 2, 12, 13, and 16, Burke raises violations of the First and Fourteenth Amendments to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc-1, in his practice of the Hindu faith.  Burke contends that the Defendants have violated the First and Fourteenth Amendments by denying him an hour of worship akin to a Sunday worship service afforded to Christian inmates, and by refusing to seek Hindu volunteers from the Bismarck, North Dakota community to assist him in his Hindu worship.  Burke alleges that the Defendants violated the First Amendment and the Religious Land Use and Institutionalized Persons Act by denying him the use of items important to his religious faith:  camphor, kumkum, incense, and a butter lamp.


1)      **CLAIMS 2 AND 12**

In claim 12, Burke argues Thursdays are holy days in the Hindu religion, and the Defendants denied him a Hindu worship service on Thursdays even though the Defendants provide over twenty religious services and study hours for Christian inmates during the week.  Essentially, Burke is alleging that the prison regulations denied him the equal protection of laws in violation of the Fourteenth Amendment by not affording Hindus the same opportunity for religious services as is given to members of other religions.  Burke also alleges that the denial of a Hindu worship service on Thursdays violated his First Amendment right to the free exercise of religion.

5

In claim 2, Burke alleges that the Defendants denied his First Amendment right to the free exercise of religion in retaliation for filing a civil action, <u>Burke v. North Dakota Dep't of Corr. and Rehab.</u>, 294 F.3d 1043 (8th Cir. 2002), against the Defendants.  Burke states,

> On 12-21-06 at the North Dakota State Penitentiary, hereafter known as NDSP, inmate Christmas party Plaintiff and a witness approached Deputy Warden of Operations, Patrick Branson.  Plaintiff ask Branson, "Why did you take away my religious study day, the Christian inmates get a bible study"  Branson then said, "Don't come to me whining about your religion or being disabled, you should have thought about that before you sued us, you don't have anything coming, so go bother someone else".

<u>See</u> Docket No. 17 (errors in original).

### a)      <u>FOURTEENTH AMENDMENT</u>

On November 14, 2006, Burke filed a grievance against Chaplain Dave Vaughn, the prison chaplain at the NDSP, in which he complained that he was denied a Hindu worship service on Thursdays.  Burke states as follows:

> My Thursday Hindu sat sang meeting was taken from me.
>
> It was established with Chaplain Dave Vaughn over three years ago that Thursday is a holy day of prayer for worshipers of the Hindu God Shiva.  That is the reason that my Hindu sat sag has been held on Thursdays for the last three or four years.  The Chaplain knows this I proved it to him, in fact I proved to the Chaplain that I should have daily access to my Shiva Lingham and my statues of my deities, to anoint them with water, ghee, and holy oil.  For awhile I did have daily access, but I was having trouble with my mental illness and the medicine I am on.  I cut it back to the essential day of Thursdays for worship and prayer, and Tuesdays were for study and reflection . . . .

<u>See</u> Docket No. 46-5 (errors in original).

Prior to November 2006, Hindu services were offered to the inmates two hours per week, Tuesdays from 12:30 p.m. to 1:30 p.m. and Thursdays from 12:30 p.m. to 1:30 p.m.  Burke, who is

the only practicing Hindu at the NDSP, failed to take advantage of the weekly service hours offered

for Hindu worship.  Subsequently, the Defendants reduced Hindu services from two hours to one

hour per week, with the weekly services held on Tuesdays from 5:45 p.m. to 6:45 p.m.

Burke argues the denial of a Hindu worship service on Thursdays violates the Fourteenth

Amendment.  Burke states,

> Christian inmates have over twenty religious services and bible studies they can
> attend everyone of them if they wish.  The Buddhist inmates, Asatru inmates, also
> have a religious study day and a education day.  The room that Burke uses for his
> religious service and study remains empty all the time, there is no reason Burke can
> not use it, and it is next door to the Chaplains office.

See Docket No. 70 (errors in original).

The equal protection clause of the Fourteenth Amendment prohibits religious discrimination

by the state.  The Fourteenth Amendment provides, "No State shall make or enforce any law which

shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive

any person of life, liberty, or property, without due process of law; nor deny to any person within its

jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  "This mandate has been

interpreted to require the government 'to treat similarly situated people alike,' and it extends to prison

inmates." Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999) (quoting City of Cleburne v. Cleburne

Living Ctr., Inc., 473 U.S. 432, 439 (1985)).  To succeed on an equal protection claim, Burke "must

show that he is treated differently than a similarly situated class of inmates, that the different

treatment burdens one of his fundamental rights, and that the different treatment bears no rational

relation to any legitimate penal interest." Murphy v. Missouri Dep't of Corr., 372 F.3d 979, 984 (8th

Cir. 2004).

The Court must first determine whether Burke is, in fact, similarly situated to members of

other religious groups that he claims were accommodated.  To survive summary judgment, Burke

7

"must identify the characteristics of the class he claims to be similarly situated to and present some evidence that other groups within the class were not also restricted in similar ways."  Id.  Burke has provided the "Religious Activity Schedule" for the NDSP from November 19, 2006, through November 25, 2006, which identifies the daily schedule of religious services for that week. According to the "Religious Activity Schedule," it is clear that inner-faith and Catholic worship services were provided on Sunday, November 19, 2006, and that Bible study hours were provided later in the week for various religions.

Chaplain Dave Vaughn is responsible for evaluating the "legitimacy of a religious activity or materials and the inmate's participation in such activity."  See Docket No. 86.  The Defendants permit religious meetings in accordance with faith obligations, such as holy days and weekly worship.  See Docket No. 46-4.  Chaplain Vaughn "designates the area for meeting location, staff supervision, volunteer worker or spiritual advisor participation and program monitoring."  See Docket No. 46-4.

Chaplain Vaughn has independently researched the tenets of Hinduism to accommodate Burke's religious needs:

> I have learned that most observant Hindus engage in some type of formal worship (*puja*).  They usually have a special place that is used as a shrine, and contains a picture or statue symbolizing the individual's chosen form(s) of God (*ishta*). Typically a devotee enters a shrine at dawn and/or dusk to make an offering to God, symbolized by placing items such as food, water and flowers before the image, with incense, oil lamp (*diya*) and bell to ring.  The devotee thus symbolically offers to God items that can be enjoyed by each of the five senses.  A time of meditation (*dyana*) can then be offered.
>
> . . .
>
> Furthermore, in my research I have not found any weekday specified as a worship day for Shiva, Hindus.  Also, the new Tuesday evening worship schedule is actually more conducive to the worship at dusk as mentioned above.

See Docket No. 46-5.

Burke has not provided any evidence to refute Chaplain Vaughn's research of Hinduism.  Nor has Burke provided evidence to establish that the tenets of Hinduism are similarly situated to other religious groups found at the NDSP.  As a result, Burke has not established that other religions recognized at the NDSP which receive both a worship service in accordance with a holy day and a bible study hour are similarly situated to Hinduism.  Accordingly, Burke has failed to raise a genuine issue of material fact as to whether the denial of a Hindu worship service on Thursdays violates the Fourteenth Amendment.

### b)   FIRST AMENDMENT

Prior to November 2006, inmates at the NDSP were permitted to attend Hindu services two hours per week, on Tuesdays and Thursdays from 12:30 p.m. to 1:30 p.m.  Subsequent to November 2006, Hindu services were provided at the NDSP on Tuesdays from 5:45 p.m. to 6:45 p.m.  Patrick Branson, the Deputy Warden for Operations at the NDSP, stated the reasons for the schedule change:

> The schedule change was made to accommodate Burke because, at the time, he had lost his privileges for afternoon recreation due to his noncompliance with job requirements.  Additionally, the Chaplain's independent research of the Hindu religion revealed that most observant Hindus typically enter a shrine at dawn and/or dusk to make an offering to God.  Changing the schedule to begin at 5:45 p.m. was more conducive to this Hindu doctrine than the original 12:30 time slot.  At the time of the schedule change, Burke was the only inmate attending Hindu services and he was not taking advantage of the two hours scheduled.

See Docket No. 46-4.

Burke contends that the Defendants reduced Hindu services from two hours to one hour per week in retaliation for Burke filing a civil lawsuit against the Defendants, and that the denial of a Hindu worship service on Thursdays violates his First Amendment right to the free exercise of

9

religion.  In other words, Burke charges the Defendants with unconstitutional retaliation against the exercise of his First Amendment right to the free exercise of religion.

Religious freedom is guaranteed by the free exercise clause of the First Amendment, which provides:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.  "First Amendment protection only attaches to beliefs rooted in religion, as opposed to purely secular beliefs or personal preferences."  Love v. Reed, 216 F.3d 682, 687 (8th Cir. 2000).  "In analyzing a Free Exercise claim, 'we consider first the threshold issue of whether the challenged governmental action infringes upon a sincerely held religious belief and then apply the [Turner v. Safley, 482 U.S. 78 (1987)] factors to determine if the regulation restricting the religious practice is reasonably related to legitimate penological objectives.'"  Gladson v. Iowa Dep't of Corr., 551 F.3d 825, 831 (8th Cir. 2009) (citing Murphy, 372 F.3d at 983).

In Turner, the United States Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  482 U.S. at 89.  To determine the reasonableness of the regulation, a court should consider four factors:  (1) "there must be a 'valid, rational connection' between the prison regulation and the legitimate government interest"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there is an "alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological objectives."  Id. at 89-91 (emphasis in original).

As a preliminary matter, the Court must determine that Burke's belief in shaivite Hinduism is sincere.  Burke has admitted that his belief in shaivite Hinduism "is sincere."  Burke has provided

a certificate which indicates that in August 2003 he was granted the honorary Hindu title of "Swami" from the Universal Life Church in Modesto, California.  See Docket No. 71-2.  The Defendants have not offered any evidence to refute Burke's sincerity.  Accordingly, Burke satisfies the threshold sincerity requirement.  At issue is whether the prison regulation restricting an additional hour of Hindu services per week is reasonably related to legitimate penological objectives.

Applying the first factor under Turner, the Court must find that there is a valid, rational connection between the prison regulation and a legitimate government interest.  Deference should be accorded to the judgment and expertise of prison officials, "particularly with respect to decisions that implicate institutional security."  Murphy, 372 F.3d at 983.  As the chaplain at the NDSP, Chaplain Vaughn has been designated to "evaluate matters of a religious nature relating to the legitimacy of a religious activity or materials and the inmate's participation in such activity."  See Docket No. 86.  The NDSP provides religious services to a large number of inmates with a wide variety of religious needs. "The Religious Advisory Committee considers the number of inmates wishing to participate in a religious group activity and plans accordingly.  The NDSP is accountable for all the religious groups in the penitentiary."  See Docket No. 86.  Inmates at the NDSP are allowed to attend one hour of religious service per week.  See Docket No. 46-4.  The services are held during recreational hours, which grants inmates the discretion to attend the services.  See Docket No. 46-4.

The evidence establishes that prior to November 2006, Burke failed to utilize the two hours scheduled for Hindu services per week.  Subsequently, Hindu services were reduced from two hours to one hour per week.  By reducing the scheduled hours for Hindu services, resources were freed to provide other religious services to inmates practicing their religions.  The reduction to one hour of religious service per week was consistent with the policies at the NDSP.  See Docket No. 46-4

11

("Pursuant to the facility policies, inmates are allowed to attend one hour of religious service each week.  The institution's weekly schedule of religious services and activities is made available to all inmates.").  The Court finds that the Defendants have a legitimate government interest in preserving scarce prison resources for religious worship.  The Court further finds that there is a reasonable connection between reducing the number of hours for Hindu services and maximizing the resources.

The second factor under Turner is whether an inmate has an alternative means of exercising his religion.   Burke has not shown he has been denied access to attend Hindu services, and has only shown that such access is limited to one hour per week.  Burke has failed to provide any evidence establishing Thursdays as holy days of worship in the Hindu faith.  Nor has Burke provided any evidence to refute Chaplain Vaughn's assertion that shaivite Hindus do not recognize a specific day of the week as a holy day for worship.  Accordingly, the evidence establishes that the Defendants have afforded Burke sufficient means for Hindu worship on Tuesdays from 5:45 p.m. to 6:45 p.m.

Under the third factor of Turner, the Court must consider what impact the accommodation of the asserted constitutional right will have on (a) guards and other inmates and (b) the allocation of prison resources.  The Court defers to the Defendants' determination that resources at the NDSP to serve the religious needs of the inmates are scarce.  The Defendants are under a burden to allocate prison resources efficiently and effectively to minimize waste.  The evidence reveals that the inmates are allowed to attend one hour of religious service per week.  The Defendants allowed Burke to attend an additional hour of religious service per week prior to November 2006.  Burke failed to take advantage of the extra hour and, therefore, the Defendants reduced Hindu worship services to one hour per week.  By reducing Hindu worship services to one hour per week, prison resources were freed to be devoted to participating inmates.  The efficient allocation of prison resources is a

12

legitimate government interest.  Accordingly, the Court finds that this factor weighs in favor of a finding that the regulation limiting Hindu worship services to one hour per week is reasonable.

The fourth factor under <u>Turner</u> is whether there are ready alternatives to the challenged regulation.  "[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.  But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  <u>Turner</u>, 482 U.S. at 90-91 (emphasis in original). While the Court could envision other means by which the Defendants could accommodate Burke's religious needs, the Court defers to the Defendants on their choice of means to further legitimate penological interests.  Policies at the NDSP allow inmates to attend one hour of religious service per week, and the Hindu worship service offered on Tuesdays satisfies prison policies.  Burke requests that the Defendants to provide an additional hour for religious services regardless of the cost to valid penological interests.  Burke has not presented any alternative means of accommodating his constitutional right to practicing his religion at de minimis cost to valid penological interests.

Burke contends the regulation limiting Hindu services to one hour per week violates the First Amendment, and the Defendants have unconstitutionally retaliated against Burke by reducing Hindu services to one hour per week.  Burke contends he needs an additional hour per week on Thursdays for worship.  Burke has failed to provide any evidence that his faith mandates a minimum number of hours of worship per week, or that Thursdays are holy days for shaivite Hindus.  Even though Burke prefers to engage in Hindu worship on Thursdays, the evidence reveals that shaivite Hindus may worship on any day and often worship at dawn and/or dusk.

13

The record establishes that the Defendants have fully accommodated Burke's rights.  Burke, along with other inmates incarcerated at the NDSP, may attend one hour of religious service per week.  Prior to November 2006, the Defendants provided Burke with an additional hour of religious service per week, but Burke failed to utilize the extra hour.  The Defendants have established that the regulation limiting an inmate's attendance of religious services to one hour per week was enacted to preserve scarce prison resources.  Prison resources are scarce and must be utilized efficiently and effectively.  Burke can adequately engage in Hindu worship on Tuesdays from 5:45 p.m. to 6:45 p.m. The Court finds that Burke has failed to raise a genuine issue of material fact as to whether the regulation limiting Hindu services to one hour per week violated his right to the free exercise of religion.

**c)**     <u>**OVERVIEW**</u>

The Court finds that Burke has failed to raise a genuine issue of material fact of a Fourteenth Amendment or First Amendment violation on claims 2 and 12.  Summary judgment is granted on claims 2 and 12.

**2)**     <u>**CLAIM 13**</u>

In claim 13, Burke alleges that the Defendants  have denied him items which are an essential part of Hindu worship.  In the Court's order dated May 16, 2007, the Court determined that in claim 13, Burke raised a cognizable free exercise claim under the First Amendment.  Burke clarified in his response to the Defendants' motion for summary judgment that he seeks relief pursuant to the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1, on this

14

claim.  The Court will address whether the denied use of camphor, kumkum, incense, and a butter lamp violated Burke's First Amendment right to the free exercise of religion and RLUIPA.

### a)   <u>FIRST AMENDMENT</u>

The penal regulation restricting Burke's use of camphor, kumkum, incense, and a butter lamp satisfies constitutional muster if the regulation is reasonably related to legitimate penological interests.  <u>See</u> <u>Turner</u>, 482 U.S. at 89.  To make this determination, the Court will examine the four factors under <u>Turner</u>.

First, the Court must determine whether there is a valid, rational connection between the regulation and a legitimate government interest.  Pursuant to N.D.C.C. § 12-47-12, the warden, subject to the approval of the director of the DOCR, shall make laws regarding the admission of visitors, the government of officers and employees of the penitentiary, and the conduct of inmates imprisoned in the penitentiary.  In accordance with N.D.C.C. § 12-47-12, Warden Tim Schuetzle and Director of Corrections and Rehabilitation Leann K. Bertsch, have approved the DOCR Policies and Procedures Manual.  The Manual includes the procedures for religious practice of a variety of religions, including Hinduism.  The Manual identifies both personal religious items and congregate religious items for Hindu worship:

C.   Personal Religious Items

1.   A religious medallion and chain, often an image of the Hindu's favorite deity; and,

2.   Prayer beads (plastic), consisting of 108 beads.

The individual uses the prayer beads in the recitation of the mantras as well as the breathing exercises that are part of the specific yoga followed.

15

PRAYER BEADS: Only plastic prayer beads are permitted in the institutions.

    D.     Congregate Religious Items

        1.     A statue of the deity, usually Shiva or Vishnu;

        2.     Bell;

        3.     Conch Shell;

        4.     Flowers, silk or artificial are acceptable substitutes;

        5.     A mixture of camphor and KumKum, (red powder made from haldi, tumeric and alum).

        6.     Dry rice (½ cup);

        7.     Containers (small) for water and a small spoon or ladle; and

        8.     Incense.

See Docket No. 46-4.  Chaplain Vaughn has approved Burke to have the following personal items for Hindu worship: prayer beads, religious books, holy oil, incense oil, religious music, and a compact disc player to listen to the music.  See Docket No. 86.  Chaplain Vaughn has not approved all of the congregate items "because there is no Hindu religious group and no qualified, approved Hindu representative at the NDSP."  See Docket No. 86.  Burke is the only practicing Hindu in the NDSP.

Chaplain Vaughn has explained the difference between personal religious items and congregate religious items.  "Personal items are items which are personal to each inmate and may be kept by the inmate if they are approved and received under the inmate handbook guidelines.  Those items are subject to inspection."  See Docket No. 86.  "Congregational items are those items only used during a religious group's scheduled service time.  These items are stored by me.  During a

religious group's scheduled service time, these items are controlled by NDSP staff or by a qualified representative of the congregation approved by me and the Warden."  See Docket No. 86.

"Burke has been approved to have access to those congregational worship items for his Hindu faith which are not deemed a security or safety threat to the institution including a statute (sic) of his deity of choice, bell, shells, flowers, dry rice, small containers for water, a spoon and ladle."  See Docket No. 86.  The Defendants contend that Burke has been denied the use of fire because the NDSP has policies and procedures which prohibit the inmates from handling fire, that Burke has been denied incense because incense can be used to disguise the odor of marijuana and requires access to fire, and that Burke has been denied the use of a butter lamp because of the safety risks associated with lighting the lamp.

Prison inmates retain constitutional rights protected, but the rights are subject to limitations "in light of the needs of the penal system."  Gladson, 551 F.3d at 831.  "These rights are limited, however, by the fact of incarceration and valid penological objectives, such as deterrence of crime, rehabilitation of prisoners, and institutional security."  Fegans v. Norris, 537 F.3d 897, 902 (8th Cir. 2008).  A prison regulation that violates inmates' constitutional rights is valid if the regulation is reasonably related to legitimate penological interests.  Turner, 482 U.S. at 89.  The United States Supreme Court adopted this flexible standard because "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration."  Id.  Accordingly, great deference is accorded to the judgment and expertise of prison officials, particularly regarding decisions that implicate institutional security.  Goff v. Graves, 362 F.3d 543, 549 (8th Cir. 2004).

The Court finds that the Defendants clearly have a legitimate penological interest in regulating an inmate's use of religious items to preserve the safety and security of the NDSP. The Defendants have established that the prohibited Hindu congregate religious items pose a threat to the order and security of the prison.

The second <u>Turner</u> standard asks whether Burke has another way to exercise his constitutional right to practice his religion. To accommodate Burke's religious needs, Chaplain Vaughn has provided substitutes to the prohibited congregate religious items. Chaplain Vaughn states, "Burke has been provided substitutes for incense and a butter lamp. He has been given access to incense oils and a small portable trouble light. Incense oil is placed on the bulb which heats the oil and dispenses the oil fragrance into [the] air." <u>See</u> Docket No. 86. The Defendants have denied Burke kumkum and camphor because "[Burke] has not shown that this is a fundamental tenet of Hindu personal worship." <u>See</u> Docket No. 86.

The record reveals Burke was provided substitutes to the congregate religious items that pose threats to the internal safety of the prison. Burke has not provided evidence that incense oils and a small portable trouble light are insufficient congregate religious items. The Court finds that Burke clearly has an alternative method of practicing his Hindu faith by using the substitute congregate items during worship.

The third <u>Turner</u> standard requires the Court to evaluate the impact that the accommodation of Burke's right to practice his religion would have on guards and other inmates. The Court finds that the accommodation could have a significant impact on the security of other inmates and guards, and on the internal safety of the prison. The rule prohibiting an inmate from handling fire was put in place to protect the safety and security of inmates and prison staff. The rule prohibiting inmates from burning incense was put in place because the odor of burning incense may be used to mask the

odor of burning marijuana.  The Court finds that if Burke were allowed to handle fire and use incense during Hindu worship services, it could potentially have a significant ripple effect on other inmates demanding the right to handle fire and burn incense for personal or congregate worship.  "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."  Turner, 482 U.S. at 90.  Accordingly, the Court defers to the informed discretion of the Defendants as to the safety and security threats created by inmates using incense and fire during religious services.

The fourth Turner factor asks whether there are alternatives that fully accommodate Burke's right to practice his religion at de minimis cost to valid penological interests.  The Defendants have provided substitutes for incense and a butter lamp.  The Court finds that the Defendants have provided adequate alternatives to the prohibited congregate items.

The Court finds that under Turner, the Defendants have a legitimate penological interest in protecting the safety and security of NDSP staff and inmates by prohibiting the use of camphor, kumkum, incense, and a butter lamp.  The evidence reveals that the Defendants have gone to great depths to accommodate Burke's religious needs by providing substitute congregate items for use during worship, and that the substitute items are adequate alternatives to the prohibited Hindu congregate religious items.  The Court finds that Burke has failed to raise a genuine issue of material fact as to whether the denial of camphor, kumkum, incense, and a butter lamp violated his First Amendment rights.

19

b)   **RLUIPA**

Burke alleges that the Defendants denied him the use of camphor, kumkum, incense, and a butter lamp but allowed other religious groups to use similar items in their congregate worship. Burke alleges the Defendants violated the RLUIPA, 42 U.S.C. § 2000cc-1, by denying him these key religious items.  An inmate's claim under RLUIPA is subject to review under a different standard than a First Amendment claim.   "'By enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to constitutional free exercise claims.'"  Gladson, 551 F.3d at 832 (quoting Murphy, 372 F.3d at 986).  RLUIPA provides, in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> (1)    is in furtherance of a compelling governmental interest; and
>
> (2)    is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  The Eighth Circuit Court of Appeals has defined "substantial burden" as meaning that the government action "must significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion."  Murphy v. Missouri Dep't of Corr., 506 F.3d 1111, 1115 n. 7 (8th Cir. 2007).

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005).  While the government must meet

a higher burden in RLUIPA claims than for First Amendment claims, the Court affords "'a significant degree of deference to the expertise of prison officials in evaluating whether they met that burden.'" Gladson, 551 F.3d at 832 (quoting Murphy, 372 F.3d at 987).

The Court has determined that the regulation is reasonably related to a legitimate penological objective of maintaining prison security, and that the regulation satisfies the lesser burden of proof under the First Amendment.  The Defendants have provided Burke with personal religious items which are kept by Burke, and have provided Burke with congregate religious items that the Defendants have determined are not safety hazards.  With respect to the congregate religious items that are safety hazards, the Defendants have provided substitutes which the Court has determined are adequate alternatives.  The Court finds that Burke has not shown that the denial of camphor, kumkum, incense, and a butter lamp created a substantial burden on the exercise of his religion.  As a result, Burke has failed to raise a genuine issue of material fact as to whether the denial of camphor, kumkum, incense, and a butter lamp violated RLUIPA.

### c)      **OVERVIEW**

The Court finds that Burke has failed to raise a genuine issue of material fact of a First Amendment or RLUIPA violation on claim 13.  Summary judgment is granted on claim 13.

### 3)      **CLAIM 16**

In claim 16, Burke alleges that Chaplain Vaughn has failed to find Hindu volunteers outside of the prison population to assist Burke in the study of his religion, but seeks outside volunteers for Christian inmates.  Essentially, Burke is alleging that the Defendants violated the equal protection

clause of the Fourteenth Amendment.  Though his argument is not a model of clarity, Burke also alleges a violation of the First Amendment.

a)      **FOURTEENTH AMENDMENT**

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  To establish an equal protection claim, Burke must demonstrate that he, as a practicing Hindu, was treated differently than similarly situated religious groups.

For purposes of this claim, the Court finds that the Hindu religion is similarly situated to other religious groups which are recognized and accepted by the Defendants in the Policies and Procedures Manual as religions practiced within the prison.  To succeed on this equal protection claim, Burke "must show that he is treated differently than a similarly situated class of inmates, that the different treatment burdens one of his fundamental rights, and that the different treatment bears no rational relation to any legitimate penal interest."  Murphy, 372 F.3d at 984.

Pursuant to the DOCR Policies and Procedures Manual, the chaplain shall solicit and approve qualified representatives to lead religious activities.  See Docket No. 46-4.  Deputy Warden Patrick Branson has clarified the chaplain's role in finding outside religious volunteers:  "Chaplain Vaughn is responsible for developing and coordinating community religious resources for the enhancement of religious opportunities for the inmates within NDSP.  The Chaplain solicits and approves qualified representatives to lead religious activities by contacting religious organizations  (i.e., churches, mosques, temples, prison ministries, etc.) within the surrounding community."  See Docket No. 46-4.

In the present case, Chaplain Vaughn has attempted to locate qualified representatives to lead Hindu religious activities:

22

> I have attempted to locate and find a qualified representative to lead Hindu religious activities at NDSP by contacting religious organizations (i.e., churches, mosques, temples, prison ministries, etc.) within the surrounding community but have been unsuccessful.  There are no Hindu Temples or organizations in North Dakota, South Dakota, or Montana.  Although Minneapolis does have three temples, the distance makes it an impractical resource.  I attempted to contact those temples and the phone number of one of the temples was disconnected, the second did not speak English, and the third could only be emailed.  Although I did send an email to that temple, I have not received a reply.

See Docket No. 86.

It is clear the Defendants' policy of using approved outside volunteers is an across-the-board policy that is the same regardless of the religion.  The policy states that an outside religious volunteer must be a qualified representative of that religion, and that such representatives are found by contacting religious organizations such as churches, mosques, temples, and prison ministries.  Chaplain Vaughn has stated that there are no Hindu temples in North Dakota, South Dakota, or Montana and, consequently, no qualified Hindu representatives in those states.  Chaplain Vaughn has further stated that there are three Hindu temples in Minneapolis, Minnesota.  The Chaplain has attempted to contact all three temples to find a qualified representative for Burke, but has been unsuccessful in this effort.

Burke has failed to demonstrate that the Defendants have treated Hindus differently than other religious groups in locating and permitting outside volunteers to assist in religious study.  The Fourteenth Amendment requires only that similarly situated groups be treated the same.  The record reveals that Chaplain Vaughn has attempted to locate qualified Hindu representatives, just as he has attempted to locate qualified representatives for other religious groups.  Whether the Chaplain is successful in locating qualified representatives for each recognized religion in the NDSP is immaterial for purposes of the Fourteenth Amendment analysis.  Accordingly, the Court finds that

Burke has failed to raise a genuine issue of material fact of a Fourteenth Amendment violation on claim 16.

**b)      FIRST AMENDMENT**

Burke alleges that the Defendants' failure to locate a qualified Hindu representative violates his free exercise of religion.  Burke demands that the Defendants be required to locate a Hindu religious advisor for him.  Burke states, "Plaintiff has no one for his religious needs, coming in from the outside, like the Christians and Native Americans.  No volunteer whatsoever.  The Christians have numerous and the Native American have several.  There are Hindus in Bismarck, and Seva, which means service is a tenet of the Hindu faith."  See Docket No. 70 (errors in original).

The Eighth Circuit Court of Appeals has addressed whether inmates have a right to a religious advisor of their choice under the First Amendment.  "The Constitution does not require that a religious advisor be provided for every sect represented in a penitentiary.  Nor does the Constitution require that prisoners be provided the religious advisor of their choice or one that belongs to their individual religious sect."  Blair-Bey v. Nix, 963 F.2d 162, 163-64 (8th Cir. 1992).[1]  "Only when a

---

[1]  In Blair-Bey v. Nix, 963 F.2d 162 (8th Cir. 1992), inmates brought an action pursuant to 42 U.S.C. § 1983 contending that the prison's policy of providing only one Islamic advisor violated their First Amendment right to the free exercise of religion.  The inmates belonged to a different Islamic sect, Moorish Science Temple (MST), than did the religious advisor.  The Eighth Circuit Court of Appeals held that the prison's policy of providing a single Islamic advisor did not violate the inmates' First Amendment rights.  The court stated,

> Although the Islamic advisor may not be the religious leader the prisoners prefer, his employment by the prison does not interfere with the MST inmates' ability to exercise freely their religious beliefs.  The MST inmates enjoy the same religious freedoms as other inmates.  The penitentiary permits the MST inmates to pray and worship together, receive and read MST literature, possess religious artifacts, receive MST advisors as visitors, and otherwise follow their religious beliefs within the bounds of the penitentiary's operating rules.

24

prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the prisoner's free exercise rights are substantially burdened in this manner." Weir v. Nix, 114 F.3d 817, 821 (8th Cir. 1997) (citing SapaNajin v. Gunter, 857 F.2d 463, 464 (8th Cir. 1998)).

In SapaNajin, the Eighth Circuit determined that an inmate's First Amendment rights were violated by the prison's policy to provide only one medicine man for the Native American inmates. The inmate proved that he was a member of a band of Indians which had beliefs contrary to the beliefs of the medicine man. Because of the "sizeable difference in religious practices" between the inmate's and the medicine man's beliefs, the Eighth Circuit held that the inmate's First Amendment rights were violated. SapaNajin, 857 F.2d at 464-65. However, the Eighth Circuit cautioned that the Constitution does not require the state to provide a religious leader for each inmate, and urged the parties to find a middle ground between assigning each inmate his or her own religious advisor and providing a religious advisor from only one religious perspective. The Eighth Circuit recognized that the solution involved rotating a variety of different medicine men through the prison to serve the maximum needs of inmates because such action is "simple and no more expensive than the Department's former practice." Id. at 465.

In the present case, the Court finds that Chaplain Vaughn's alleged failure to find a qualified Hindu representative to assist Burke in the study of his religion does not violate the First Amendment. Chaplain Vaughn has stated that the closest qualified Hindu representatives are located in Minneapolis, Minnesota. There are three Hindu temples in Minneapolis, and Chaplain Vaughn has contacted the three temples but was unsuccessful in finding a religious advisor for Burke. Chaplain

---

Blair-Bey, 963 F.2d at 164. As a result, the court determined that the inmates failed to state a First Amendment cause of action.

Vaughn stated, "I attempted to contact those temples and the phone number of one of the temples was disconnected, the second did not speak English, and the third could only be emailed.  Although I did send an email to that temple, I have not received a reply."  See Docket No. 86.  The evidence clearly reveals that Chaplain Vaughn has made reasonable attempts to locate a qualified religious advisor for Burke.  Unlike in SapaNajin, bringing in a qualified Hindu advisor to the NDSP is neither simple nor inexpensive.  The First Amendment does not guarantee that every inmate is entitled to a religious advisor with beliefs congruent to his own.  See Weir, 114 F.3d at 820.  "Rather, prisoners must simply be given a reasonable opportunity to exercise their religious freedom guaranteed by the First and Fourteenth Amendments."  Blair-Bey, 963 F.2d at 164.

Burke has been given a reasonable opportunity to exercise his religious beliefs.  The Defendants have provided Burke with access to one hour of Hindu worship service per week, they have permitted Burke to have personal religious items for Hindu worship, and they have provided Burke with congregate religious items deemed safe for use during worship.  The alleged failure of the Defendants to provide Burke with a Hindu religious advisor does not prevent Burke from exercising his religious beliefs.  The Court finds that Burke has failed to raise a genuine issue of material fact of a First Amendment violation on claim 16.

### c)   **OVERVIEW**

The Court finds that Burke has failed to raise a genuine issue of material fact of a Fourteenth Amendment or First Amendment violation on claim 16.  Summary judgment is granted on claim 16.

B.     **CLAIMS 3 AND 4 – FAILURE TO PROTECT/RETALIATION FOR FILING GRIEVANCES**

In claims 3 and 4, Burke alleges that the Defendants retaliated against him for filing civil actions against them by placing inmate Harry Leftbear, a "known racist Native American" who "hates caucasians," in a cell next to Burke's cell.   See Docket No. 17.  Burke alleges that the Defendants placed Leftbear in that cell "in hopes that Leftbear would attack plaintiff as punishment for the civil action brought by Plaintiff."  See Docket No. 17.  On January 16, 2007, Burke and Leftbear engaged in a physical altercation.  Burke subsequently filed a grievance with Warden Schuetzle in which he argued that Officer J. Peterson let Leftbear attack him and did not try to prevent the attack.  Officer J. Peterson ultimately cited Burke with a Class A rule infraction for engaging in disorderly conduct.  Burke contends that Officer J. Peterson cited Burke for the infraction in retaliation for Burke filing the grievance against him.  On January 22, 2007, the Disciplinary Committee at the NDSP found that Burke engaged in the prohibited act of Disorderly Conduct, an A-43 offense.  Burke appealed this determination to Warden Schuetzle who granted a new hearing.  On rehearing, the District Committee reduced Burke's charges from a Class A offense to a Class B offense of disorderly conduct.

1)     **EIGHTH AMENDMENT**

The Eighth Amendment proscribes the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  The Eighth Amendment prohibition against cruel and unusual punishment imposes a duty upon correctional officers to protect inmates from harm by other inmates.  Williams v. Mueller, 13 F.3d 1214, 1216 (8th Cir. 1994).  "The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates and to protect them from violence by other prisoners."  Nei v. Dooley, 372 F.3d 1003, 1006 (8th Cir. 2004).  "A prison official violates the

eighth amendment if he or she 'acts with deliberate indifference to a substantial risk of harm to the prisoner.'" Blades v. Schuetzle, 302 F.3d 801, 803 (8th Cir. 2002) (quoting Perkins v. Grimes, 161 F.3d 1127, 1130 (8th Cir. 1998)). What constitutes deliberate indifference has not been specifically defined. However, the Eighth Circuit has stated that to satisfy deliberate indifference, a prisoner

> need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm . . . . Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

Ambrose v. Young, 474 F.3d 1070, 1076-77 (8th Cir. 2007) (quoting Farmer v. Brennan, 511 U.S. 825, 842 (1994)). Therefore, to prevail on a failure-to-protect claim, the inmate must make two showings: (1) that he is incarcerated under conditions creating a substantial risk of harm and (2) that the prison officials knew of and disregarded the excessive risk to inmate health or safety. Jensen v. Clarke, 73 F.3d 808, 810 (8th Cir. 1996).

The affidavit submitted by Ron Bjelland, Lieutenant of the NDSP, indicates that since the January 16, 2007, altercation with Burke, "Harry Leftbear has not been charged or disciplined for fighting or assault." See Docket No. 46-2. A history of Leftbear's disciplinary history from July 2001 to July 2008 has been provided. The following incidents were described by the Defendants:

1.  Leftbear received a disciplinary conviction for assault, an A-13 infraction, on James Forehand (Caucasian) for a January 8, 2002, incident. Leftbear believed Forehand disrespected him by closing a door on him and bumping into him in the hall earlier in the day. Leftbear went into Forehand's dorm cubicle and punched him 5 or 6 times in the head and once in the neck.

2.  Leftbear received a disciplinary conviction for fighting, an A-20 infraction, with Gailyn Newmann (Native American) for a March 7, 2002, incident. Newman made disparaging remarks to Leftbear, and Leftbear punched Newman in the mouth.

3. On February 25, 2003, an incident report was filed against Leftbear for assaulting Lee Jensen (Caucasian). Following an investigation the disciplinary committee found Leftbear guilty of fighting, an A-20 infraction. Leftbear wrestled Lee to the ground, but the committee believed Lee provoked the incident.

4. On December 10, 2003, Leftbear was found guilty of assaulting Alfred Randall (Caucasian) for a December 4, 2003, incident. Leftbear struck Randall in the face because he believed Randall was taking a swing at him. Leftbear apologized to Randall following the incident and took full responsibility for his conduct before the committee.

5. Leftbear received a disciplinary conviction for an assault, an A-13 infraction, on Kevin Hanson (Caucasian) for a March 27, 2004, incident. Leftbear told Hanson to be quiet because he was trying to sleep, but Hanson continued to bang on a table, so Leftbear hit him three times.

6. On August 31, 2004, Leftbear and Mark Demarce (Native American) confronted Corry Wenger (Caucasian) over racial comments they believed Wenger made. Leftbear and Demarce tried to strong arm Wenger into giving them a package of Ramen Noodles. Wenger refused to give them the Ramen noodles, so Demarce threatened to stab Wenger. Wenger backed away and got up onto his bed. Leftbear climbed up and hit Wenger approximately four times in the head.

7. On March 18, 2006, Leftbear gave Dakota Alton (Caucasian) a black eye. When inmate Alton was questioned by NDSP staff about his injuries, he at first refused to talk, but later said that Harry Leftbear had hit him. However, he did not indicate why. When Leftbear was asked about the incident, he admitted hitting Alton and explained that Alton was messing with him for the last four days. Leftbear received a disciplinary conviction for assault.

See Docket No. 71-2.

Upon Leftbear's most recent arrival at the NDSP in December 2006, he was housed in the North Unit which is the orientation programming unit for new arriving inmates. Following orientation, Leftbear was housed in the East Housing Unit which is one of two general housing units. "Prisons are, by the very nature of many of those persons housed within their walls, dangerous, violent, and oftentimes unpredictable." Falls v. Nesbitt, 966 F.2d 375, 380 (8th Cir. 1992). Although

the evidence establishes that Leftbear was an easily provoked inmate, Burke has failed to provide any evidence to establish that the Defendants knew, or had reason to know, that Leftbear posed a threat of serious injury to Burke.  Burke admitted that he never had any problems with Leftbear prior to the January 16, 2007, incident.  <u>See</u> Docket No. 46-2 ("I get along with with Harry Leftbear always have . . . . This is the first time I've had problems with him.") (error in original).  More important, Burke has acknowledged that he provoked the altercation with Leftbear.  <u>See</u> Docket No. 46-2 ("I did stick my chin out and did say if you [Leftbear] hit me you [Leftbear] are going to [Administrative Segregation]").  Accordingly, the Court finds that Burke has failed to provide any evidence to establish that the Defendants violated Burke's Eighth Amendment rights when they housed Leftbear in a cell next to Burke's cell.

### 2)   **FIRST AMENDMENT**

Burke alleges that subsequent to the January 16, 2007, altercation with Leftbear, he filed a grievance with Warden Schuetzle that Officer J. Peterson did not attempt to break up the altercation between Burke and Leftbear, and that subsequent to filing this grievance Officer J. Peterson filed a false disciplinary charge against Burke in retaliation.  "The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity."  <u>Lewis v. Jacks</u>, 486 F.3d 1025, 1029 (8th Cir. 2007).  "'Prison officials cannot properly bring a disciplinary action against a prisoner for filing a grievance that is determined by those officials to be without merit anymore than they can properly bring a disciplinary action against a prisoner for filing a lawsuit that is judicially determined to be without merit.'"  <u>Cowans v. Warren</u>, 150 F.3d 910, 911 (8th Cir. 1998) (quoting <u>Sprouse v. Babcock</u>, 870 F.2d 450, 452 (8th Cir. 1989)).  "Although the filing of a false disciplinary charge is not itself actionable under [42 U.S.C.] § 1983, the filing of a disciplinary charge becomes actionable

if done in retaliation for the inmate's filing of a grievance." Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994). To prevail on a retaliation claim, Burke has the heavy burden of "showing that the prison officials who disciplined him had an impermissible motive for doing so, and that but for this impermissible motive, the disciplinary charges would not have been brought." Orebaugh v. Caspari, 910 F.2d 526, 529 (8th Cir. 1990). An inmate's claim for retaliation must fail where the discipline was in fact imposed for an actual violation of prison rules or regulations. Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1993).

Following the altercation between Burke and Leftbear, the Defendants investigated the circumstances surrounding the incident. Burke and Leftbear, as well as the witnessing officers, completed incident reports. In Burke's incident report, he admitted that he provoked the altercation with Leftbear. Burke stated, "I did stick my chin out and did say if you hit me you are going to [Administrative Segregation]." See Docket No. 46-2. Burke admitted that in saying this he "may have said the wrong thing to Harry [Leftbear]." See Docket No. 46-2. The investigation records reveal that Burke had committed the acts for which he was found guilty. As a result, Burke has failed to provide any evidence that "but for" the alleged retaliation, he would not have been written up and disciplined for his involvement in the altercation. The Court finds that Burke has failed to raise a genuine issue of material fact of a First Amendment violation on claims 3 and 4.

31

3)    **OVERVIEW**

The Court finds that Burke has failed to raise a genuine issue of material fact of an Eighth Amendment or a First Amendment violation on claims 3 and 4.  Summary judgment is granted on claims 3 and 4.

C.    **CLAIM 6 – RETALIATION THROUGH REFUSAL TO ACCOMMODATE DISABILITY**

In claim 6, Burke alleges that the Defendants have refused to accommodate his disability in retaliation for filing a civil action against the Defendants.  Burke was convicted of two counts of murder and one count of arson in state district court in North Dakota.  On September 17, 1998, Burke was sentenced to two life sentences without the possibility of parole on the murder convictions and ten years on the arson conviction.  Burke was remanded to the custody of the DOCR for incarceration and hard labor pursuant to N.D.C.C. § 12-47-04.  Burke contends that he suffers from mental illness and Hepatitis C, and that the Social Security Administration has determined that he is disabled and awarded him benefits for the disability.  Because of this disability determination, Burke contends he should not be forced to work at the NDSP.

The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  "Because the prohibition on involuntary servitude does not extend to those who have been convicted of crimes, compelling prison inmates to work does not violate the Thirteenth Amendment."  McMaster v. State of Minn., 819 F. Supp. 1429, 1441-42 (D. Minn. 1993).  However, exposing inmates to labor which is beyond their physical

strength, dangerous to their health, or unduly painful may constitute cruel and unusual punishment in violation of the Eighth Amendment.  Madewell v. Roberts, 909 F.2d 1203, 1207 (8th Cir. 1990).

In Ray v. Mabry, 556 F.2d 881 (8th Cir. 1977), an inmate alleged he worked 90 to 120 hours per week doing manual labor, and he could not do the work assigned to him because he was physically disabled.  The Eighth Circuit Court of Appeals determined that the inmate's claims could constitute a violation of the Eighth Amendment if the inmate could establish that the prison officials knowingly compelled him to perform physical labor which was beyond his strength, which constituted a danger to his life or health,  or which was unduly painful.

Unlike in Ray, Burke is not alleging that he is being forced to work beyond his physical strength or that his jobs at the NDSP are a danger to his life or health.  Rather, he is alleging that he is disabled under the standards used by the Social Security Administration and, therefore, should not be required to work in prison.  Inmates at the NDSP may make requests for accommodations in their working conditions on account of a disability.  The evidence reveals that Burke has never made such a request.  See Docket No. 46-6.  Further, the Defendants have accommodated Burke on previous occasions when he felt tired from Hepatitis C treatments and allowed him to quit work early and return to his cell.  See Docket No. 46-5.  The allegations which he raises do not satisfy the standard set forth in Ray.  Burke has not provided any evidence that he is being forced to work beyond his physical strength or that the jobs are endangering his life or health.

Further, Burke has failed to present any evidence of retaliation.  The "Inmate Work Programs" section of the Policies and Procedures Manual establishes the policies for inmate work programs and related compensation.  The Manual provides, "All inmates are expected to work during their incarceration."  See Docket No. 46-6.  "At any time during an inmate's incarceration if they either quit a job or refuse to take a job, a Class A incident report must be written and the inmate shall

go to the Disciplinary Committee.  Any inmate (under any good time law) that refuses to work, quits a job or refuses an assignment will have their [Performance Based Sentence Reduction]/Good Time terminated until they start a new job."  See Docket No. 46-6.  The evidence clearly demonstrates that all inmates within the DOCR system must work regardless of their disability status.  Accordingly, the Court finds that Burke has failed to raise a genuine issue of material fact of an Eighth Amendment violation on claim 6.  Summary judgment is granted on claim 6.


### D.     <u>CLAIM 7 – DISABILITY DISCRIMINATION UNDER THE ADA</u>

Burke contends he is disabled because he is mentally ill and has been diagnosed with Hepatitis C.  He argues that these "disabilities" entitle him to be placed in a special housing unit that houses disabled inmates, and that the Defendants have discriminated against him in violation of Title II of the Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. § 12131 et seq., by failing to place him in special housing.

Title II of the ADA provides:  "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Under the ADA, a "public entity" includes state and local governments, as well as their agencies and instrumentalities.  42 U.S.C. § 12131(1).  The plain text of Title II of the ADA unambiguously extends to state prisons and prisoners.  <u>Pennsylvania Dep't of Corr. v. Yeskey</u>, 524 U.S. 206, 213 (1998).  To prevail on a claim under Title II of the ADA, Burke must establish that "he is a qualified individual with a disability denied participation in, or the benefits of, the services, programs, or activities of a public entity because of his disability."  <u>Gorman v. Bartch</u>, 152 F.3d 907, 912 (8th Cir. 1998).

Burke contends he is mentally ill and has been diagnosed with Hepatitis C, and that these conditions qualify him as disabled under Title II of the ADA.  Burke contends he has been found disabled within the meaning of the Social Security Act by an administrative law judge.  An administrative law judge initially found Burke to be disabled with an onset disability date of January 2, 1987, on the grounds of schizoid/sociopathic personality disorder.  On November 6, 1996, an administrative law judge found that Burke continued to be disabled under Sections 216(i) and 223 of the Social Security Act, codified at 42 U.S.C. §§ 416(i), 423.

The Social Security Act and the ADA were enacted to help people with disabilities, but in different ways.  The Social Security Act provides monetary benefits to every insured individual who "is under a disability."  42 U.S.C. § 423(a)(1).  Under the Social Security Act, "disability" means "(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months, or (B) blindness"  42 U.S.C. § 416(i).

"The ADA seeks to eliminate unwarranted discrimination against disabled individuals in order both to guarantee those individuals equal opportunity and to provide the Nation with the benefit of their consequently increased productivity."  Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 801 (1999) (citing 42 U.S.C. §§ 12101(a)(8), (9)).  The ADA prohibits an entity from discriminating against a "qualified individual on the basis of disability" regarding job application procedures, hiring, advancement, discharge of employees, employee compensation, job training, and other terms and conditions of employment.  42 U.S.C. § 12112(a).

The definition of "disabled" under the Social Security Act is fundamentally different from the ADA definition of "qualified individual" with a disability.  An individual may be disabled under

the Social Security Act but may not meet the more fact-intensive requirements for disability under the ADA.  Cleveland, 526 U.S. at 802-04.  "[W]hereas the ADA always required an individualized inquiry into the ability of a particular person to meet the requirements of a particular position the [Social Security Administration] permits general presumptions about an individual's ability to work. In that regard, the [Social Security Administration] considers some conditions to be presumptively disabling . . . .  Thus, an individual can have a 'disability' under the [Social Security Administration] definition and yet in fact still be able to work."  Weigel v. Target Stores, 122 F.3d 461, 466 (7th Cir. 1997); see Johnson v. State, Or. Dep't of Human Res., Rehab. Div., 141 F.3d 1361, 1365 (9th Cir. 1998) (finding that the ADA requires a highly fact-specific analysis to determine whether a qualified individual can perform a certain job with reasonable accommodation, whereas only a general assessment is used by the Social Security Administration to determine whether a person is disabled and unable to work); Feldman v. Am. Mem'l Life Ins. Co., 196 F.3d 783, 790 (7th Cir. 1999) (finding that the Social Security Administration considers whether the individual has a condition that is categorically disabling whereas the ADA delves into a fact-intensive analysis as to whether the individual could work at his particular job with or without reasonable accommodations); E.E.O.C. v. Stowe-Pharr Mills, Inc., 216 F.3d 373, 378 (4th Cir. 2000) (stating that the ADA prohibits an employer from discriminating against a qualified individual with a disability who can perform the essential functions of his job with or without reasonable accommodation, whereas the Social Security Administration provides monetary benefits to an individual who is unable to do his previous work and cannot engage in substantial gainful employment); Talavera v. Sch. Bd. of Palm Beach County, 129 F.3d 1214, 1220 (11th Cir. 1997) (finding that a determination of disability by the Social Security Administration does not mean that the individual is a qualified individual with a disability under the ADA); Pena v. Houston Lighting & Power Co., 154 F.3d 267, 269 (5th Cir. 1998) (finding

36

that the Social Security Administration's definition of disability differs significantly from a "qualified individual" under the ADA) .

The Court agrees with the majority of our sister circuits that a determination of disability by the Social Security Administration is not controlling for a determination of ADA disability. The finding that Burke is disabled under the Social Security Act is relevant, but not dispositive. Burke contends that he is disabled under the ADA because of mental illness and Hepatitis C.

As stated previously, to prevail on a claim under Title II of the ADA, Burke must show that he is a qualified individual with a disability who suffered an adverse employment decision because of his disability. Under the ADA, "disability" means "a <u>physical or mental impairment that substantially limits one or more major life activities of such individual</u>"; "a record of such an impairment"; or "being <u>regarded as having such an impairment</u>." 42 U.S.C. § 12102(1) (emphasis added). An individual satisfies the requirement of "being regarded as having such an impairment" if "the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

The ADA defines "major life activities" as including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). A major life activity also includes "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). "An impairment is 'substantially limiting' if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts

the condition, manner, or duration under which an individual can perform a particular major life activity as compared to an average person in the general population." Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 948-49 (8th Cir. 1999).  To determine whether an individual is substantially limited in a major life activity, the Court must consider "(1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-term impact." Id. at 949 (citing 29 C.F.R. § 1630.2(j)(2)(i)-(iii)).


1)    **ACTUAL DISABILITY**

Burke contends he suffers from actual disabilities in the form of mental illness and Hepatitis C.  Burke wishes to be housed in the South Unit which is preferred housing at the NDSP.  The South Unit is the newest housing unit, has more modern facilities than the other housing units, and is handicapped accessible.  Burke argues he should be placed in the South Unit because he is disabled.  Burke states,

> Plaintiff is considered to mentally ill to be house in a cell with another inmate, and Plaintiff has Hepatitis C, even though he was successfully treated for Hepatitis C, per prison policy Plaintiff can not be housed with any other inmate.  NDSP has a special housing unit, South Unit where inmate get special privileges, such as extended time out of their cell.  Because Plaintiff has these condition he is being denied this special housing because of his **"disabilities"** and has to go on a waiting list behind abled inmate who are already in South Unit sharing a cell, Plaintiff has to wait behind all these abled inmate to get a single cell, before Plaintiff can get a single cell . . . .

See Docket No. 17 (emphasis and errors in original).

With respect to his allegation of mental illness, Burke does not specify what conditions constitute his "mental illness."  Burke simply states,

I might be one of the following mental illnesses:

1.    Bipolar Disorder.  Note that is what I think I have!

2.      Chronic Paranoid Schizophrenia

3.      Delusional Disorder, persecutory type.  I have been diagnosed with this before, and was put in a mental hospital for this.

4.      Obsessive Compulsive Disorder.  I have episodes of this.

5.      Paranoid Schizophrenia.

6.      Psychosos, NOS.

7.      Psychotic Disorder.

8.      Schizoaffective Disorder.  I have episodes of this.

9.      Schizophrenia.

10.     Schizophrenia.  Paranoid Type.

See Docket No. 70 (emphasis added) (errors in original).  An administrative law judge initially determined that Burke was disabled under the Social Security Act for schizoid/sociopathic personality, with an onset disability date of January 2, 1987.  On November 6, 1996, an administrative law judge found that Burke continued to be disabled under the Social Security Act. See Docket No. 71-2.

Burke fails to describe his mental condition.  The Court will assume for the sake of argument that Burke continues to display schizoid/sociopathic personality traits.  The ADA's regulations define "physical or mental impairment" as including "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).  Even if Burke has a mental impairment, he must make a showing that his impairment substantially limits a major life activity.  Burke has failed to list the manifestations of his alleged mental impairment.  He has not described the nature and severity, the duration or anticipated duration, or the long-term impact of his mental impairment.  Further, he has failed to demonstrate that

39

his mental impairment substantially limits his ability to care for himself, perform manual tasks, see, hear, eat, sleep, walk, stand, lift, bend, speak, breathe, learn, read, concentrate, think, communicate, or work.  See 42 U.S.C. § 12102(2)(A).  Nor has Burke alleged any facts to show that his mental impairment substantially limits the operation of a major bodily function.  See 42 U.S.C. § 12102(2)(B).  Accordingly, the Court finds that Burke has failed to present any evidence that he has a mental impairment which substantially limits a major life activity.         With respect to Burke's diagnosis of Hepatitis C, Burke alleges that Hepatitis C limits the following major life activities:

> 1.      Being able to moved down to preferred housing when holding a prison job and free of major rule violations, the ability to share a cell with another inmate.  Plaintiff can not share a cell because of his Hepatitis C.  That also holds true because plaintiff is too mentally ill to share a cell in South Unit.  Because of this status, plaintiff hastto go on a single cell list behind other inmates sharing a cell in South Unit, who do not have plaintiffs life limiting conditions.

> 2.      Other inmates don not want to play any time of contact sports with plaintiff and have a phobia against plaintiff because of his Hep C.

> 3.      There are several job s plaintiff can never have, including handling food, because of his Hep C.

> 4.      At one point other inmates were complaining that plaintiffs clothing was washed with theirs.

See Docket No. 70 (errors in original).  Burke states that "[i]f the ADA extends to prisoners in prison, that would also mean that, the life style a prisoner is forced to live would be covered under the ADA, when Hepatitis C, restricts or limits one of these activities of daily prison life, so it would go beyond just an individuals reproductive and sexual activity . . . ."  See Docket No. 70 (errors in original).

The Defendants concede that Hepatitis C is a physical impairment, but argue that Hepatitis C does not substantially limit a major life activity for Burke.  Burke's allegations do not speak to whether he can care for himself, perform manual tasks, see, hear, eat, sleep, walk, stand, lift, bend,

speak, breathe, learn, read, concentrate, think, communicate, or work.  See 42 U.S.C. § 12102(2)(A).

Nor do his allegations address whether Hepatitis C substantially limits the operation of a major bodily

function.  See 42 U.S.C. § 12102(2)(B).  Nor has Burke described the nature and severity, or the

long-term impact, of his physical impairment of Hepatitis C.  Accordingly, the Court finds that Burke

has failed to provide any evidence that Hepatitis C substantially limits his ability to perform a major

life activity as contemplated by the ADA.


### 2)      "REGARDED AS" DISABLED

Having determined that there are no genuine issues of material fact as to whether Burke is

actually disabled by virtue of either a mental or physical impairment, Burke must establish that the

Defendants "regarded" him as being disabled.  To establish a disability under the "regarded as"

prong, Burke must establish that (1) he has a mental or physical impairment that does not

substantially limit major life activities but is treated by the Defendants as constituting such limitation;

(2) he has a mental or physical impairment that substantially limits major life activities only as a

result of the attitudes of others toward such impairment; or (3) he has none of the impairments

defined in 29 C.F.R. § 1630.2(h)(1) or (2), but is treated by the Defendants as having a substantially

limiting impairment.  29 C.F.R. § 1630.2(l).  Burke's mere assertion that he is disabled under the

ADA by way of a mental condition is insufficient to satisfy a motion for summary judgment.

Burke has failed to satisfy the factors set forth under the "regarded as" prong.  First, Burke

has not provided any evidence that the Defendants have treated any of Burke's alleged mental and/or

physical impairments as substantially limiting major life activities.  Second, Burke has not provided

any evidence that he has a mental and/or physical impairment which substantially limits major life

activities only as a result of the attitudes of others toward the impairment.  Third, Burke has not

provided any evidence that he is treated by the Defendants as having a substantially limiting impairment.  Accordingly, the record is devoid of any evidence establishing that Burke has a mental and/or physical impairment which the Defendants regarded as a disability under the ADA.

### 3)      OVERVIEW

Burke has failed to provide any evidence that he is a qualified individual with a disability under the ADA.  Burke has not shown he suffers from either a mental or physical impairment that substantially limits a major life activity, nor has Burke shown the Defendants regarded him as having a mental and/or physical impairment.  Therefore, the Court will not address whether Burke was denied benefits on account of a "disability."  Summary judgment is granted on claim 7.

### E.      CLAIMS 10 AND 14 – FAILURE TO PROVIDE ADEQUATE MEDICAL CARE/DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

In claims 10 and 14, Burke contends the Defendants have deprived him of adequate medical care while incarcerated at the NDSP.  In claim 10, Burke alleges:

> The treatment department of NDSP which is in charge of mental health treatment refuse to give Plaintiff any type of therapy.  The treatment department wont send for any of Plaintiff numerous records of his mental health treatmentsa and institutional stay.  The treatment department refuses to do any type of psychological test on Plaintiff which is essential to be able to properly diagnose and treat disabilities.

See Docket No. 17 (errors in original).  In claim 14, Burke alleges on January 4, 2007, he was seen by medical staff at the NDSP and was later seen by Dr. Chris A. Meeker at Medcenter One Hospital in Bismarck, North Dakota for testicular pain, and "Dr. Meeker prescribed Plaintiff to wear and athletic supporter for the next two weeks, to take pressure off of plaintiffs, testicle and epididymis so they could heal."  See Docket No. 17 (errors in original).  Burke further contends that following

42

his appointment with Dr. Meeker, he attempted to order an athletic supporter through the medical department at the NDSP.   Kathy Bachmeier, the medical director of the NDSP, "called [the athletic supporter] clothing and said [Burke] would have to buy it himself."   See Docket No. 17.   Burke placed an order to purchase an athletic supporter, but didn't receive it until January 18, 2007, the day on which the person in charge of inmate accounts made medical purchases.   Burke contends that the delay in obtaining an athletic supporter caused him to experience extreme testicular pain.   See Docket No. 17.   Accordingly, Burke contends NDSP officials exhibited deliberate indifference to his serious medical needs in violation of the Eighth Amendment.

"To prevail on a claim of constitutionally inadequate medical care, the inmate must show that the prison officials' conduct amounted to 'deliberate indifference to [the prisoner's] serious medical needs.'"   Dulany v. Carnahan, 132 F.3d 1234, 1237-38 (8th Cir. 1997) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).   "'Deliberate indifference has both an objective and a subjective component.'"   Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir. 2009) (quoting Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006)).   Burke must demonstrate (1) that he suffers from objectively serious medical needs and (2) that the prison officials knew of, but deliberately disregarded, the needs. Dulany, 132 F.3d at 1239.

Burke contends he has objectively serious mental and physical needs.   With respect to his mental needs, Burke states,

> Plaintiff has problems with everyday functioning.   And feels he has been misdiagnosed or under diagnosed.   Plaintiff has been diagnosed in the past with mild to moderate, Tourettes Syndrome, obsessive compulsive disorder, several learning disorders, too many to name, Plaintiff knows he is not functioning at a normal level. It is more than just a mood disorder and personality disorder.   Plaintiff goes through several days of mania, where he just lays in bed but does not sleep, and is in an excited mood, sometimes Plaintiff has a lot of energy.   Thenit turns to depression where Plaintiff sleeps constantly . . . . **Is it not cruel and unusual punishment to deny someone a diagnoses and treatment, if this would improve their quality of**

43

**life.  A psychological battery test, I think it is called a MMP II, would solve a lot
of questions**.

See Docket No. 70 (emphasis in original) (errors in original).  With respect to his physical needs, he

contends he suffers from epididymitis and an infection in his testicle.  As a result, Burke contends

he experiences "excruciating" testicular pain which is alleviated when he wears an athletic supporter.

The Court is without sufficient information to determine whether Burke's mental and physical

conditions are objectively serious.  However, for the sake of argument, the Court will assume that

Burke suffers from objectively serious medical needs.

Having determined that Burke's medical needs are objectively serious, Burke cannot prevail

on these claims unless he establishes that the treatment department at the NDSP and Medical Director

Kathy Bachmeier actually knew of, but deliberately disregarded, his serious medical needs.  To make

this showing, Burke must establish a "'mental state akin to criminal recklessness:  disregarding a

known risk to the inmate's health.'"  Vaughn, 557 F.3d at 908 (quoting Gordon v. Frank, 454 F.3d

858, 862 (8th Cir. 2006)).  "'[T]he failure to treat a medical condition does not constitute punishment

within the meaning of the Eighth Amendment unless prison officials knew that the condition created

an excessive risk to the inmate's health and then failed to act on that knowledge.'"  Dulany, 132 F.3d

at 1239 (quoting Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996)).  "As long as this threshold is not

crossed, inmates have no constitutional right to receive a particular or requested course of treatment,

and prison doctors remain free to exercise their independent medical judgment."  Id. (citing Long,

86 F.3d at 765).

In this case, Burke has failed to establish that the Defendants were deliberately indifferent to

his serious mental needs when they denied him psychological testing.  Burke contends the treatment

department at the NDSP has failed to provide him a psychological test, yet he was tested upon entry

44

at the NDSP.  In addition, Burke acknowledges that he is evaluated by a psychiatrist every six weeks and is prescribed medications for his mental needs.  As a result, Burke cannot show that the treatment department knew of his serious mental needs and disregarded them.  The evidence establishes that the treatment department was aware of Burke's mental needs and sufficiently attended to those needs.  The treatment department's failure to provide a psychological test does not curtail the extensive medical treatment that Burke has received for his mental needs.  Burke has failed to raise a genuine issue of material fact of an Eighth Amendment violation on claim 10.  Summary judgment is granted on claim 10.

Burke next contends the Defendants were deliberately indifferent when they delayed his access to an athletic supporter.  "Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs."  Dulany, 132 F.3d at 1239.  "'[W]hen the inmate alleges that the delay in treatment is the constitutional deprivation, the objective seriousness of the deprivation should also be measured 'by reference to the *effect* of delay in treatment.'"  Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997) (quoting Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), *abrogated on other grounds by* Hope v. Pelzer, 536 U.S. 730 (2002)) (emphasis in original).  An inmate complaining that a delay in medical treatment violated his constitutional rights "'must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.'"  Crowley, 109 F.3d at 502 (quoting Hill, 40 F.3d at 1188).

The Eighth Circuit Court of Appeals imposes a strict standard on claims involving delays in medical treatment.  See Jenkins v. County of Hennepin, Minn., 557 F.3d 628 (8th Cir. 2009) (finding that a one week delay in providing medical care to an inmate complaining of a swollen jaw and jaw

pain was not deliberately indifferent); Bryan v. Endell, 141 F.3d 1290 (8th Cir. 1998) (finding that

a delay in attending to an inmate's broken hand was negligence at best and did not amount to an

Eighth Amendment violation even though the delay ultimately made surgery impractical); Logan v.

Clarke, 119 F.3d 647 (8th Cir. 1997) (finding that medical personnel were not deliberately indifferent

to the inmate's back pain and fungal skin infection even though the efforts the prison doctors took

to alleviate the inmate's pain were not as extensive as those a private health-care provider might have

taken); Crowley v. Hedgepeth, 109 F.3d 500 (8th Cir. 1997) (finding that a delay in providing an

inmate prescription sunglasses did not constitute deliberate indifference because the inmate failed to

show that the delay had an adverse effect on his eye condition); cf. Moore v. Jackson, 123 F.3d 1082

(8th Cir. 1997) (finding a genuine issue of material fact as to whether medical personnel violated the

Eighth Amendment by waiting eight months before treating an inmate's infected tooth); Gordon v.

Frank, 454 F.3d 858, 863 (8th Cir. 2006) (finding deliberate indifference where an inmate

complained of extreme pain and difficulty breathing, was denied medical care, and died shortly

thereafter because "[a] reasonable officer would know that it is unlawful for officers to delay medical

treatment for an inmate with obvious signs of medical distress").

The record reveals that Burke's delay in receiving an athletic supporter in January 2007 did

not have a detrimental effect on his health. On January 4, 2007, Burke was seen by Dr. Meeker at

Medcenter One Hospital for testicular pain and epididymitis, and Dr. Meeker recommended that

Burke wear an athletic supporter. See Docket No. 46-9. On January 9, 2007, Burke was ordered a

medical card to purchase an athletic supporter. See Docket No. 46-9. On January 10, 2007, Burke

filed a Step 1 grievance in which he alleged deliberate indifference because he had not received the

athletic supporter. On January 15, 2007, Medical Director Kathy Bachmeier responded to Burke's

grievance and indicated that a medical card had been issued to Burke for the purchase of an athletic

supporter. Bachmeier also explained that Burke could receive the same medical benefits as the athletic supporter could provide "by laying down, elevating [his] scrotum and using ice as tolerated." See Docket No. 46-9.

Burke has failed to provide any verifying medical evidence that the delay in receiving the athletic supporter had an adverse effect on his medical condition of epididymitis. The evidence reveals that Bachmeier issued a medical card within a reasonable period of time after Burke's appointment with Dr. Meeker and provided alternative treatment to alleviate Burke's testicular pain. The Court finds that Bachmeier was attentive to Burke's medical needs and did not intentionally delay in providing Burke with an athletic supporter. Accordingly, the Court finds that Burke has failed to raise a genuine issue of material fact of an Eighth Amendment violation on claim 14. Summary judgment is granted on claim 14.


### F.      CLAIM 11 – CRUEL AND UNUSUAL CONDITIONS OF CONFINEMENT

Burke contends that as a result of being unemployed, he has been denied honor housing, afternoon recreation, and access to sunlight which constitutes cruel and unusual punishment in violation of the Eighth Amendment. Burke has since withdrawn this claim because he is employed within the prison system and has full access to afternoon recreation. The Court finds as moot Burke's allegations under claim 11.


### G.      CLAIM 17 – RETALIATION BY DISCLOSING PLAINTIFF AS CONFIDENTIAL INFORMANT

Burke contends that in retaliation for filing an earlier lawsuit against the state, NDSP officials released a letter to inmate Michael Damron which identified Burke as a confidential informant. The

Eighth Amendment requires prison officials to "'take reasonable measures to guarantee the safety

of the inmates.'"  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S.

517, 526-27 (1984)).  It is well-established that prison inmates have an Eighth Amendment right to

be protected from violence by other inmates.  Curry v. Crist, 226 F.3d 974, 977 (8th Cir. 2000).  "A

prison official violates this right when 'he is deliberately indifferent to the need to protect an inmate

from a substantial risk of serious harm from other inmates.'"  Id. (quoting Newman v. Holmes, 122

F.3d 650, 652 (8th Cir. 1997)).  "The Eighth Amendment prohibits the foreseeable and unnecessary

risk of the gratuitous and wanton infliction of pain."  Irving v. Dormire, 519 F.3d 441, 451 (8th Cir.

2008).

        In Irving, the Eighth Circuit Court of Appeals considered whether prison officials falsely

labeling an inmate as a snitch violated the inmate's Eighth Amendment rights to be free from cruel

and unusual punishment.  The Eighth Circuit held that falsely labeling an inmate as a snitch "is to

unreasonably subject that inmate to the threat of a substantial risk of serious harm at the hands of his

fellow inmates.  After all, who better knows the opprobrium and consequent effect thereof that

attaches to the label of snitch than those who work daily with the inmate population."  Irving, 519

F.3d at 451.

        To establish a failure to protect cause of action, Burke must show (1) he is incarcerated under

conditions posing a substantial risk of serious harm and (2) the prison officials recklessly disregarded

that risk.  See Riley v. Olk-Long, 282 F.3d 592, 595 (8th Cir. 2002).  Burke has failed to make either

showing.  On July 9, 2003, Burke filed a Step 1 grievance in which he stated, "On 7-08-03 at 6:00pm

I waa told that Michael Damron was circulating a copy of a confidential letter I had written Pat

Branson about three years ago.  this letter should have never been released it was a violation

N.D.C.C. § 44-04-18.3(3) . . . . I feel this release of this confidential informant letter about Damrons

intent to place a computer virus in the prisons computer.  The prison released this to get me hurt because I have a current lawsuit against this prison . . . ."  <u>See</u> Docket No. 46-8 (errors in original).  In response to Burke's grievance, Deputy Warden Pat Branson responded, in part:

> The facts in this situation are as follows:  the staff of the North Dakota State Penitentiary did <u>not</u> release this confidential letter to Mr. Damron.  The letter was included in a packet of legal material released to Mr. Damron from a States Attorney.  We have <u>no</u> control over what a States Attorney sends an inmate related to a law suit filed by an inmate.

<u>See</u> Docket No. 46-8.

N.D.C.C. § 12-47-36(3)(j) permits a state or federal court to inspect the case history, medical, psychological, and treatment records of a person in the custody of the DOCR who has commenced litigation when the records are relevant to the litigation.  Burke has failed to provide any evidence to contradict the Defendants' assertion that a State's Attorney, and not NDSP officials, released Burke's letter to inmate Michael Damron as discovery in Damron's civil action against North Dakota prison officials.  Accordingly, the Court finds that Burke has failed to establish a genuine issue of material fact as to whether the Defendants violated Burke's Eighth Amendment rights on claim 17.  Summary judgment is granted on claim 17.


**IV.   CONCLUSION**

The Court has carefully and thoroughly reviewed the entire record, and finds that Burke has failed to raise a genuine issue of material fact on any of the twelve claims (claims 2, 3, 4, 6, 7, 10, 11, 12, 13, 14, 16, and 17) which the Court found to be cognizable.  The record is devoid of any competent, reliable evidence to support Burke's allegations of constitutional and statutory violations.  There are no genuine issues of material fact for trial and, as such, the Defendants are entitled to

summary judgment as a matter of law.  The Defendants' motion for summary judgment (Docket No.

40) is **GRANTED**.

       **IT IS SO ORDERED.**

    Dated this 5th day of June, 2009.

                      */s/  Daniel L. Hovland*_____
                      Daniel L. Hovland, Chief Judge
                      United States District Court